UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                     :

UNITED STATES OF AMERICA,       :
                                     :

           - v. -                 :                 S13 12 Cr. 171 (JPO)
                                     :

MIKHAIL ZEMLYANSKY, et al.,     :
                                     :

                 Defendants.        :
                                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S OPPOSITION TO
## <u>DEFENDANTS' POST-TRIAL MOTIONS</u>

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America

Edward Y. Kim
Peter M. Skinner
Daniel S. Noble
Assistant United States Attorneys
- Of Counsel -

# **Table of Contents**

Preliminary Statement ................................................................................................ 1

Background ................................................................................................................. 3

    A. The S13 Indictment ............................................................................................ 3

    B. The Trial ............................................................................................................. 4

    C. The S18 Indictment ............................................................................................ 4

Argument ................................................................................................................... 5

    I. The Doctrine of Collateral Estoppel Does Not Require Dismissal of Count One
    Against Zemlyansky ............................................................................................... 5

        A. Applicable Law ................................................................................................ 5

            1. Double Jeopardy and Issue Preclusion ........................................................ 5

            2. RICO Conspiracy ........................................................................................ 7

        B. Discussion ...................................................................................................... 8

            1. The Jury's Acquittals of Zemlyansky on Counts Two to Eight Do Not Require
            Dismissal of Count One ............................................................................... 8

            2. The Jury Did Not Resolve an Ultimate Issue on Count One ......................... 9

    II. Collateral Estoppel Does Not Require Dismissal of Counts Two through Five Against
    Gabinskaya ......................................................................................................... 17

    III. The Evidence at Trial Was Sufficient to Establish Zemlyansky's Participation in
    the RICO Conspiracy Charged in Count One ...................................................... 19

        A. Applicable Law .............................................................................................. 19

            1. Sufficiency of the Evidence ........................................................................ 19

            2. Section 1962(d) .......................................................................................... 21

        B. Discussion .................................................................................................... 22

            1. The Jury's Acquittals on Counts Two through Eight Do Not Demonstrate that the
            Evidence was Insufficient on Count One ...................................................... 22

            2. There Was Ample Evidence of Zemlyansky's Participation in the RICO
            Conspiracy ................................................................................................. 22

    IV. The Evidence at Trial Was Sufficient to Support Convictions on Counts Two
    through Five for Gabinskaya .............................................................................. 31

Conclusion ............................................................................................................... 34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
UNITED STATES OF AMERICA,                     :
                                              :
             - v. -                           :          S13 12 Cr. 171 (JPO)
                                              :
MIKHAIL ZEMLYANSKY, <u>et al.</u>,            :
                                              :
             Defendants.                      :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS

The Government respectfully submits this Opposition to the motions of defendants Mikhail Zemlyansky, Michael Danilovich, and Tatyana Gabinskaya to dismiss the remaining accounts against them pursuant to Rule 29 of the Federal Rules of Criminal Procedure on the grounds that (1) the jury's acquittals of Zemlyansky control the outcome with respect to the counts for which the jury did not reach a verdict; and (2) the evidence at trial was insufficient to support convictions with respect to the remaining counts.  For the reasons set forth below, the defendants' motions should all be denied.

### Preliminary Statement

The crux of the defendants' post-trial motions is that the jury's acquittals of Zemlyansky on seven counts require the dismissal of the remaining counts on which the jury could not agree.  For myriad reasons, however, the acquittals do not and cannot control the outcome of the remainder of this case.

First, the defendants cannot rely on the issue preclusion doctrine to dismiss the counts remaining from the S13 12 Cr. 171 Superseding Indictment pursuant to Rule 29, as a

jury's determination on one count in an indictment has no estoppel effect on its determination on other counts at the same trial.

Second, even assuming *arguendo* that the issue preclusion doctrine were applicable at this stage of the case, the defendants point to no factual issue that was decisively resolved by the jury's verdicts. There are multiple elements for each of the counts for which Zemlyansky was acquitted, and it is impossible to know on which element or elements the jury found the Government's proof lacking. The jury's verdicts therefore do not resolve any issues for any future trials of Zemlyansky, Danilovich or Gabinskaya.

Third, even if we knew why the jury acquitted Zemlyansky on certain counts, the acquittals would not prevent the Government from relitigating the RICO conspiracy. To prove a RICO conspiracy, the Government does not have to prove that a defendant or any co-conspirator actually committed a predicate act. That the jury acquitted Zemlyansky of crimes that fell within the scope of the charged pattern of racketeering therefore does not bar the Government from proving that Zemlyansky conspired to violate RICO.

Lastly, the defendants' half-hearted arguments that the evidence at trial was insufficient to convict them of the remaining counts can be swiftly rejected. At their core, the sufficiency arguments are nothing more than re-hashes of the issue preclusion arguments — that the acquittals on certain counts demonstrate the lack of evidence on the remainder. The law is clear, however, that a jury's determination on one count says nothing about the remaining counts in an indictment; each count in an indictment is regarded as if it was a separate indictment. Moreover, the evidence introduced over six weeks of trial was more than sufficient for a jury to have convicted Zemlyansky, Danilovich and Gabinskaya of the remaining counts.

**Background**

A.      **The S13 Indictment**

Zemlyansky and Danilovich were charged in all counts in the eight-count S13 12 Cr. 171 Superseding Indictment (the "S13 Indictment").  Gabinskaya was charged in four counts of the S13 Indictment — Counts Two, Three, Four and Five.

Count One charged Zemlyansky, Danilovich and others with conspiring to participate in the affairs of a racketeering enterprise, from in or about 2007 up through and including on or about February 29, 2012, in violation of Title 18, United States Code, Section 1962(d).  (S13 Indictment ¶¶ 1-24).  The charged racketeering enterprise was the "No-Fault Organization," an enterprise that was associated-in-fact to perpetrate a widespread scheme to defraud automobile insurance companies under New York's No-Fault Law by fraudulently owning, operating and controlling medical clinics that provided unnecessary and excessive treatments.  (S13 Indictment ¶¶ 1-14).  Count One charged that Zemlyansky and his co-conspirators agreed to conduct and participate in the affairs of the No-Fault Organization through a pattern of racketeering activity consisting of mail fraud, in violation of 18 U.S.C. § 1341, and money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.  (S13 Indictment ¶ 24).

Count Two charged Zemlyansky, Danilovich, Gabinskaya and others with participating in a conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, from approximately 2007 through February 29, 2012.  Count Three charged the same defendants with a substantive count of health care fraud, in violation of Title 18, United States Code, Section 1347, during the same time period.

Counts Four and Five charged Zemlyansky, Danilovich, Gabinskaya and others with, respectively, mail fraud conspiracy, in violation of Title 18, United States Code, Section

1349, and mail fraud, in violation of Title 18, United States Code, Section 1341.  The time period

for both Counts Four and Five was from approximately 2007 through February 29, 2012.

Count Six charged Zemlyansky, Danilovich and others with participating in a

money laundering conspiracy, from approximately 2007 through February 29, 2012, in violation

of Title 18, United States Code, Section 1956(h).  Counts Seven, Eight and Nine charged the

same defendants with substantive money laundering counts in violation of Title 18, United States

Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) and 1957(a), respectively.

### B.     The Trial

On November 4, 2013, following a nearly two-month trial, a jury acquitted

Zemlyansky of Counts Two through Eight.  The jury failed to reach a verdict with respect to

Count One against Zemlyansky, Counts One through Eight against Danilovich, and Counts Two

through Five against Gabinskaya.

### C.     The S18 Indictment

On January 28, 2014, a grand jury returned the S18 12 Cr. 171 Superseding

Indictment (the "S18 Indictment").  Count One of the S18 Indictment charges Zemlyansky and

Danilovich with participating in a RICO conspiracy.  The RICO conspiracy, however, is

different than that charged in the S13 Indictment.  Most significantly, the alleged enterprise is

different, as is the pattern of racketeering.  Unlike the S13 Indictment, which is limited to mail

fraud and money laundering predicates, the S18 Indictment alleges a pattern of securities fraud,

wire fraud, mail fraud, gambling, and money laundering predicates.  And unlike the S13

Indictment, which alleges a scheme to commit no-fault insurance fraud, the S18 Indictment

alleges a criminal organization that engaged in multiple criminal schemes, including securities

fraud, no-fault fraud and high stakes poker games.  The S18 Indictment thus alleges that a

4

different group of people committed a different set crimes than those alleged in the S13 Indictment.

**Argument**

**I.      The Doctrine of Collateral Estoppel Does Not Require Dismissal of Count One Against Zemlyansky**

> **A.      Applicable Law**

>> **1.      Double Jeopardy and Issue Preclusion**

The Double Jeopardy Clause provides that never "shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V. "Under this Clause, once a defendant is placed in jeopardy for an offense, and jeopardy terminates with respect to that offense, the defendant may neither be tried nor punished a second time for the same offense." Sattazahn v. Pennsylvania, 537 U.S. 101, 106 (2003). It is well settled that a defendant has been placed in jeopardy — that is, jeopardy has "attached" to the indictment — when the jury is empaneled and sworn. See United States v. Podde, 105 F.3d 813, 816 (2d Cir. 1997).

"A double jeopardy inquiry must be conducted with the purposes served by the Clause in mind." Id. As the Supreme Court recently explained, "the Clause embodies two vitally important interests." Yeager v. United States, 557 U.S. 110, 117 (2009). The first is the "deeply ingrained" principle that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." Green v. United States, 355 U.S. 184, 187–188 (1957). The second interest is the preservation of "the finality of judgments." Crist v. Bretz, 437 U.S. 28, 33 (1978).

5

A defendant seeking to invoke collateral estoppel — the "issue preclusion" component of the Double Jeopardy Clause — "bears the burden to persuade the court that the issue he seeks to foreclose was 'necessarily decided in his favor by the prior verdict.'" United States v. McGowan, 58 F.3d 8, 12 (2d Cir. 1995) (quoting United States v. Citron, 853 F.2d 1055, 1058 (2d Cir. 1988)).  Furthermore, issue preclusion only applies when the issue determined by the jury in the first trial is an "ultimate issue" in the retrial — that is, the issue necessarily decided must be an issue which the government must prove in the second trial beyond a reasonable doubt.  See Yeager v. United States, 557 U.S. at 117 ("[A] jury verdict that necessarily decided [an] issue in [a defendant's] favor protects him from prosecution for any charge for which that [issue] is an essential element."); Dowling v. United States, 493 U.S. 342, 348-49 (1990) (holding that the estoppel doctrine did not apply "because, unlike the situation in Ashe v. Swenson, the prior acquittal did not determine an ultimate issue in the present case") (citing Ashe v. Swenson, 397 U.S. 436 (1970)).

To satisfy the issue-preclusion burden, a defendant must identify:  (1) a specific factual issue or issues; (2) which the jury in the first trial necessarily decided adversely to the Government; and (3) which is an ultimate issue for retrial and not a collateral matter.  See Ashe, 397 U.S. at 443; Dowling, 493 U.S. at 350-51.  In determining whether collateral estoppel bars a later prosecution, courts should "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration."  Ashe, 397 U.S. at 444.

"Since it is usually impossible to determine with any precision upon what basis the jury reached a verdict in a criminal case, it is a rare situation in which the collateral estoppel

defense will be available to a defendant."  United States v. Tramunti, 500 F.2d 1334, 1346 (2d Cir. 1974); see also United States v. McGowan, 58 F.3d at 12 (same).  "The burden [on the defendant] is particularly onerous when the acquittal in the first trial involves the crime of conspiracy."  United States v. Clark, 613 F.2d 391, 401 (2d Cir. 1979).

### 2.    RICO Conspiracy

Title 18, United States Code, Section 1962(d), provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).  Section 1962(c) sets forth a substantive RICO offense and provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."  18 U.S.C. § 1962(c).

To establish a RICO conspiracy, "the government must prove that a defendant agreed to participate in the affairs of the enterprise through a pattern of racketeering activity." United States v. Yannotti, 541 F.3d 112, 121 (2d Cir. 2008).  In Salinas v. United States, 522 U.S. 52 (1997), the Supreme Court made clear that to establish this pattern, the Government need not prove that the defendant himself agreed that he would commit two or more predicate acts. See id. at 64 (noting that, although the RICO statute "broadened conspiracy coverage by omitting the requirement of an overt act; it did not, at the same time, work the radical change of requiring the government to prove [that] each conspirator agreed that he would be the one to commit two predicate acts."); cf. United States v. Indelicato, 865 F.2d 1370 (2d Cir. 1989) ("The significant distinctions between the proof required to establish the RICO conspiracy and the underlying substantive RICO offense belie [defendant's] claim that convictions under both the substantive

and conspiracy counts [of RICO] violate the double jeopardy clause." (citing <u>Pinkerton</u> v. <u>United States</u>, 328 U.S. 640, 643-44 (1946) (same))).  Indeed, "to be found guilty of RICO conspiracy, a defendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme."  <u>United States</u> v. <u>Yannotti</u>, 541 F.3d at 122; <u>see also</u> <u>United States</u> v. <u>Zichettello</u>, 208 F.3d 72, 100 (2d Cir. 2000) (holding that to be convicted as a conspirator under RICO, "one must be shown to have possessed knowledge of only the general contours of the conspiracy").

**B.    Discussion**

**1.    The Jury's Acquittals of Zemlyansky on Counts Two to Eight Do Not Require Dismissal of Count One**

Zemlyansky's claim that the "issue preclusion doctrine" "compel[s] dismissal of the RICO conspiracy charge" is simply incorrect.  (<u>See</u> Zemlyansky Br. 5).[1]  Whatever the double jeopardy or collateral estoppel effects of the jury's verdicts of acquittal may be, they would apply only to a subsequent trial, not to a post-trial motion for judgment of acquittal.  "[A] jury's determination on one count in an indictment has no estoppel effect on its determination on other counts at the same trial."  <u>United States</u> v. <u>Zane</u>, 495 F.2d 683, 689-90 (2d Cir. 1974); <u>cf. also</u> <u>Pinkney</u> v. <u>Keane</u>, 920 F.2d 1090, 1097 (2d Cir. 1990) ("When the defendant invokes collateral estoppel in the usual criminal case, the Government is seeking to relitigate an issue in a second prosecution that was necessarily resolved in defendant's favor in an earlier proceeding.").  The Court should thus reject Zemlyansky's improper application of the issue preclusion doctrine

---

[1]    "Zemlyansky Br." refers to the letter brief Zemlyansky submitted on January 27, 2014; "Gabinskaya Br." refers to the letter brief Gabinskaya submitted on February 4, 2014; "Tr." refers to the transcript from the trial of Zemlyansky, Danilovich, Gabinskaya, Joseph Vitoulis, and Billy Geris; and "GX" refers to a Government exhibit at trial.  On February 4, 2014, Danilovich submitted a letter joining in the post-trial motions submitted by Zemlyansky and Gabinskaya to the extent those motions are applicable to Danilovich and "inure to his benefit."  To the extent Danilovich has joined in Zemlyansky's and Gabinskaya's motions, Danilovich's motions should be denied for the reasons explained below.

and deny his Rule 29 motion.  See United States v. Mahaffy, 499 F. Supp. 2d 291, 295-96

(E.D.N.Y. 2007) (denying Rule 29 motion made on collateral estoppel grounds and holding that

"[c]onsideration of the jury's verdicts on counts otherwise disposed of is not evidence

contemplated by a post-verdict subdivision (c) motion").

### 2.      The Jury Did Not Resolve an Ultimate Issue on Count One

Even if the collateral estoppel doctrine were applicable at this stage of the

proceeding, it nonetheless would not bar the Government from relitigating Count One. [2]

Collateral estoppel does not apply because we do not know what issues the jury ultimately

resolved, and, in any event, the acquitted counts do not address ultimate issues with respect to

the RICO conspiracy.

Zemlyansky fails to identify a specific factual issue that the jury resolved

adversely to the Government.  Zemlyansky argues that because he was acquitted of the

substantive conspiracies arising out of the no-fault fraud — the health care fraud conspiracy

(Count Two), the mail fraud conspiracy (Count Four), and the money laundering conspiracy

(Count Six) — the jury necessarily determined either that the conspiracies did not exist or that he

did not knowingly participate in those conspiracies.  (Zemlyansky Br. at 4).  As Zemlyansky

concedes, however, we do not know what the jury actually determined.  (Zemlyansky Br. at 5

---

[2]      Whether the Government will relitigate Count One is now moot, as the Government has brought new (and broader) RICO conspiracy charges against Zemlyansky in the S18 Indictment. The question relevant for the remainder of the case — whether the jury's verdicts from Zemlyansky's first trial have any preclusive effect on the Government's litigation of the charges contained in the S18 Indictment — will presumably be addressed in future motion practice and are best considered in the context of the amended RICO conspiracy charge upon which the Government will re-try Zemlyansky.  See Ashe, 397 U.S. at 444 (court should take into account, among other things, "the pleadings" in determining whether issue preclusion doctrine applies). For the reasons explained below, however, the jury's acquittals resolved no ultimate issues with respect to any RICO conspiracy charge and therefore will not bar the Government from trying Zemlyansky on the new RICO conspiracy contained in Count One of the S18 Indictment.

("whatever the jury actually found . . ."); see also United States v. Jackson, 778 F.2d 933, 940

(2d Cir. 1986) ("When the first trial results in an acquittal on the conspiracy charge, generally

there is no way of telling whether the basis for the acquittal was disbelief of some portion of the

Government's evidence, and what that portion might have been, or whether the jury simply

regarded the evidence as insufficient to prove an agreement . . . .").  Zemlyansky therefore fails

to satisfy the threshold for barring relitigation of an issue — identifying the fact or issue resolved

adversely to the Government.  See United States v. McGowan, 58 F.3d at 12 (defendant "bears

the burden to persuade the court that the issue he seeks to foreclose was necessarily decided in

his favor by the prior verdict") (internal quotation omitted).

   Nor could Zemlyansky have satisfied his burden, as the acquitted counts do not go

to an ultimate issue with respect to Count One.  As the Court explained in its instructions to the

jury, the ultimate issue with respect to the RICO conspiracy was not whether Zemlyansky

himself committed the charged predicate acts — mail fraud and money laundering — but rather

whether he agreed to enter into an enterprise knowing that his conspirators would commit two or

more of the charged acts:

> To prove the defendant's agreement, the government need not
> prove that the defendant actually committed or agreed to commit
> any of the charged racketeering activities, as long as the
> Government proves that he participated in some manner in the
> overall objective of the conspiracy.  Stated another way, for
> purposes of the charged RICO conspiracy, [the] government does
> not have to prove that a defendant himself committed any of the
> charged offenses or acts.  The government only has to prove that
> the defendant entered into the charged RICO conspiracy and
> participated in the conspiracy, knowing that he or any of his co-
> conspirators would commit two or more of the charged acts or
> offenses.

(Tr. 4823-24); accord Salinas v. United States, 522 U.S. at 64 (conspiracy to commit a RICO

violation under Section 1962(d) does not require proof that any defendant committed a predicate

10

act).  Because the RICO conspiracy statute does not require proof that a defendant agreed to

commit the predicate offenses, the jury's determination that Zemlyansky was not guilty of the

offenses charged in Counts Two through Eight of the S13 Indictment does not bar the

Government from retrying Zemlyansky on Count One.  See United States v. Pizzonia, 577 F.3d

455, 459 (2d Cir. 2009) ("the object of a racketeering conspiracy is to conduct the affairs of a

charged enterprise through a pattern of racketeering, not to commit discrete predicate acts");

United States v. Shenberg, 89 F.3d 1461, 1479 (11th Cir. 1996) (acquittal on "predicate acts in

[a] RICO conspiracy count" did "not necessitate the finding that the issue of ultimate fact, i.e.,

agreement to commit two or more predicate acts or agreement to the overall objective of the

enterprise, was necessarily determined"); United States v. Persico, 832 F.2d 705, 713 (2d Cir.

1987) ("the agreement proscribed by section 1962(d) is [a] conspiracy to participate in a charged

enterprise's affairs" through a pattern of racketeering, "not [a] conspiracy to commit predicate

acts"); United States v. Ligambi, — F. Supp. 2d —, 2013 WL 5272806, at *6 (E.D. Pa. Sept. 18,

2013) (estoppel doctrine did not preclude retrial of RICO conspiracy where jury acquitted

defendant of predicate acts because "the Government is not required to prove that [the defendant]

or any co-conspirator actually committed a predicate or overt act").

        This case is thus akin to other cases where courts found that prior conspiracy

acquittals did not estop the Government from re-trying defendants on different charges arising

out of the same conduct.  For instance, in United States v. Ligambi, a case remarkably similar to

this one, a defendant named George Borgesi was charged with a RICO conspiracy count and

multiple stand-alone conspiracy and substantive counts.  2013 WL 5272806, at *1.  Like

Zemlyansky, a jury acquitted Borgesi of all of the stand-alone counts but failed to reach a verdict

on Borgesi's participation in the RICO conspiracy.  Id.  Before being re-tried on the RICO

conspiracy, Borgesi moved to preclude the Government from using the acquitted counts as predicate acts in furtherance of the RICO conspiracy.  Id. at *5.  Borgesi raised the same argument that Zemlyansky makes here (Zemlyansky Br. at 4-5) — that to convict him of the charged RICO conspiracy, the Government "would have to establish that he conspired or agreed [with another defendant] to commit the same . . . offenses that a jury ha[d] decided he did not conspire to commit."  Ligambi, 2013 WL 5272806, at *7.  Judge Robreno in the Eastern District of Pennsylvania rejected Borgesi's argument, holding that the Government may re-try Borgesi for participating in a RICO conspiracy despite the jury's acquittal of Borgesi on counts that constituted racketeering activity.  Id.  In reasoning directly applicable to this case, the court observed that "[i]f the Government does not have to prove Defendant Borgesi or any other co-conspirator actually committed or agreed to commit a specific predicate act of racketeering activity, then the jury's acquittals on the substantive counts charging offenses that qualify as racketeering acts under § 1962(c) . . . cannot be ultimate issues for a RICO conspiracy."  Id.

Similarly, in United States v. Massino, a defendant acquitted of substantive RICO and RICO conspiracy counts sought unsuccessfully to preclude the Government from retrying him for certain racketeering conduct.  411 F. Supp. 2d 316, 317-24 (E.D.N.Y. 2004).  In Massino, the defendant, Joseph Massino, had been charged in 1984 in the Southern District of New York with RICO and RICO conspiracy counts based in part on predicate acts concerning three murders that occurred in 1981.  Id. at 317.  In 1987, a jury acquitted Massino of both the RICO substantive and RICO conspiracy counts.  Id.  The jury specifically found that the Government had not proved its case with respect to the three 1981 murders.  Id.  Massino was later charged in the Eastern District of New York with RICO and RICO conspiracy based in part on predicate acts alleging that Massino committed the same three 1981 murders that the jury in

12

the Southern District of New York had found not proven.  Id. at 318.  Massino moved to dismiss

the predicate acts in the Eastern District indictment relating to the 1981 murders, arguing — like

Zemlyansky here — that in acquitting him, the Southern District jury "necessarily decided"  an

ultimate issue in the second trial; namely, that he did not have the "intent to kill" the victims of

the three 1981 murders.  Id. at 319.  Judge Garaufis of the Eastern District of New York

disagreed, holding that the doctrine of collateral estoppel did not apply because, as in this case, it

was impossible to tell the basis for the first jury's acquittals:

> [I]f Massino had been convicted of conspiracy at the first trial, the
> court would know that the jury had necessarily decided that
> Massino did have the requisite intent.  It does not . . . follow,
> however, that because Massino was acquitted of conspiracy the
> jury found that Massino did not have the requisite intent.  Instead,
> it means the jury found that the government failed to meet its
> burden of proof with respect to one of the elements of the crime of
> conspiracy.  One of these elements is a level of intent sufficient to
> be guilty of the underlying substantive offense, and another is
> joining an agreement with the purpose of carrying out that intent.
> Agreement is a separate element from intent in a conspiracy charge
> . . . .

Id. at 322.

In yet another case analogous to this one, a jury in United States v. Rigas, No. 02

Cr. 1236 (LBS), 2004 WL 2434965 (S.D.N.Y. Nov. 1, 2004), acquitted defendant Michael Rigas

of participating in a conspiracy to commit securities fraud but failed to reach a verdict as to

whether Rigas committed substantive securities fraud counts.  Id. at *1.  The same jury had

convicted Michael Rigas's co-defendants, John Rigas and Timothy Rigas, of the same securities

fraud conspiracy and substantive counts.  Michael Rigas moved for a judgment of acquittal under

Rule 29 as to the securities fraud counts, arguing — akin to Zemlyansky here — that under

principles of collateral estoppel his acquittal on the conspiracy precluded a jury from convicting

him of the substantive offense.  Id.  However, unlike Zemlyansky, who concedes that it is not

13

clear what the jury actually determined (Zemlyansky Br. at 5), Michael Rigas argued that under the facts of his case the jury's finding on an ultimate issue was plain.

Rigas argued that "the jury's conviction of John Rigas and Timothy Rigas means that the jury necessarily found the first and third elements of conspiracy satisfied (an unlawful agreement and an overt act in furtherance of the conspiracy)."  Id.  On this basis, Rigas claimed that "his conspiracy acquittal means the jury found the government failed to prove the second element of conspiracy, that he 'knowingly and willfully became a member of the conspiracy, with intent to further its illegal purpose . . . that included securities fraud.'"  Id. (ellipsis in original).  In effect, as Judge Sand observed, "Rigas allege[d] that the jury ha[d] already decided that he lacked the requisite intent to convict him of securities fraud."  Id.

Judge Sand disagreed, finding that it was "impossible to determine whether this was the view of the jury."  Id.  The court reasoned that in acquitting Michael Rigas of conspiracy to commit securities fraud, the jury may have found that Rigas "lacked the intent that is required to commit the substantive offense of securities fraud," but that alternatively, it may have found that Michael Rigas had the "requisite intent to commit securities fraud," but that the Government had "failed to prove he knowingly and willfully joined an agreement to commit securities fraud." Id.  The court thus held that an acquittal on a conspiracy count does not resolve an issue for purposes of collateral estoppel where — as here (Zemlyansky Br. at 5 ("[b]y its verdict on the predicate fraud and laundering conspiracies, Zemlyansky's jury necessarily found that either those conspiracies did not exist, he was not a knowing participant, or both")) — the jury may have found either the lack of an agreement or the lack of intent to participate in the conspiracy. Rigas, 2004 WL 2434965, at *3 (Rigas did not satisfy the "particularly onerous burden" to establish collateral estoppel where "the possibility that the jury believed that Michael Rigas

possessed the requisite intent to commit securities fraud but failed to join in an agreement to do so is not unrealistic").  Accordingly, Judge Sand denied Rigas's Rule 29 motion, as this Court should here.[3]

The purpose of the RICO statute further supports a rejection of Zemlyansky's argument.  As described in greater detail below, the Government's proof at trial established that Zemlyansky joined and in fact helped lead the RICO enterprise charged in the S13 Indictment, the No-Fault Organization.  At the same time, Zemlyansky tried to insulate himself from criminal prosecution by having other conspirators commit the crimes that profited the enterprise, such as managing the day-to-day activity of his clinics, making false statements to insurance companies, and laundering the proceeds of the fraud.   It was precisely this type of organized criminal activity the RICO statute was intended to address.  As RICO's legislative history explained, the leaders of organized criminal groups "buffer" themselves from "lower level personnel" to "maintain insulation from the investigative procedures of the police."  S. Rep. No. 91–617, at 36-37 (1969).  The lower level members of the enterprise, on the other hand, are the ones "most often arrested" because they are the ones committing the crimes that profit the organization.  Id. at 40.  Zemlyansky's acquittals therefore to not remove him from RICO's

_____

[3]      Although the defendants do not raise the point, the issue preclusion doctrine also will not prevent the Government from using evidence of the acquitted offenses to prove the RICO conspiracy at a new trial.  See Dowling, 493 U.S. at 348 (the collateral estoppel doctrine does not exclude evidence "simply because it relates to alleged criminal conduct for which a defendant has been acquitted"); United States v. Shenberg, 89 F.3d at 1481 ("the doctrine of collateral estoppel does not bar the government from using predicate acts that mirror acquitted substantive offenses to prove RICO conspiracy"); Ligambi, 2013 WL 5272806, at *6 ("The estoppel doctrine . . . does not bar the admission of evidence of other offenses, including acquitted conduct, to prove the manner and means of a RICO conspiracy.").

scope; rather, they demonstrate that Zemlyansky is the very type of criminal leader against whom the RICO statute was directed.[4]

* * *

In sum, Count One charges Zemlyansky with agreeing to participate in an enterprise, the purpose of which was enriching the members of the enterprise through fraud, knowing that his co-conspirators would commit two or more of the predicate racketeering acts — mail fraud and money laundering.  That the jury found that Zemlyansky, the "co-leader" of the RICO enterprise, did not get his hands dirty by committing fraud himself does not insulate him from prosecution for conspiring to violate the RICO statute.  See Salinas, 522 U.S. at 65 ("an actor" who "does not himself commit or agree to commit the two or more predicate acts" required of a substantive RICO violation is not "excuse[d] from the reach of the [RICO] conspiracy provision"); United States v. Applins, 637 F.3d 59, 74 (2d Cir. 2011) ("for purposes of establishing a RICO conspiracy, 'the government [is] required to prove only the existence of an agreement to violate RICO's substantive provisions'"); Yannotti, 541 F.3d at 122  ("the fact

---

[4]     In a case illustrative of the principle that racketeering leaders cannot insulate themselves from the crimes of their underlings, the Second Circuit found in United States v. Ciccone, 312 F.3d 535 (2d Cir. 2002), that the leader of a RICO enterprise was responsible for acts of violence committed by other members of the enterprise.  Id. at 542.  In Ciccone, defendant Peter Gotti was charged in a RICO conspiracy count with being a member and leader of the Gambino Organized Crime Family.  In opposing Gotti's request for bail, the Government argued that as the leader of the Gambino family, Gotti "directed the activities of his codefendants and was therefore responsible for the extortions and other crimes allegedly committed by them."  Id. at 538.  Both a Magistrate Judge and District Judge in the Eastern District of New York agreed and denied Gotti bail.  On appeal, and in the course of determining whether Gotti had been charged with a crime of violence, the Second Circuit rejected Gotti's argument that "we should consider only the predicate acts ascribed to him in the indictment (i.e., money laundering) and not the objectives and means of the RICO enterprise as a whole, as alleged through the predicate acts ascribed to all enterprise participants."  Id. at 542.  The Circuit concluded that since other members of the RICO conspiracy were alleged to have committed extortion, which was a crime of violence, the lower courts had properly found that Gotti was charged with a crime of violence, even though there was no allegation that Gotti himself committed extortion.  Id.

that the government did not prove Yannotti's specific knowledge of or participation in each predicate act conducted by other members of the Gambino Family does not undermine the sufficiency of the evidence establishing his conviction as to the charged RICO conspiracy"). Accordingly, the jury's acquittal of Zemlyansky on Counts Two through Eight did not resolve an ultimate issue controlling the outcome of Count One at any future trial.[5]

## II.   Collateral Estoppel Does Not Require Dismissal of Counts Two through Five Against Gabinskaya

Gabinskaya's claim that the jury's acquittals of Zemlyansky necessarily decided an issue of ultimate fact with respect to Counts Two through Five against Gabinskaya is meritless.  (Gabinskaya Br. at 3).

First, as explained above, "a jury's determination on one count in an indictment has no estoppel effect on its determination on other counts at the same trial."  United States v. Zane, 495 F.2d at 689-90.

Second, a jury's resolution of issues with respect to one defendant can have no preclusive effect with respect to another defendant.  Standefer v. United States, 447 U.S. 10, 24-25 (1980) (in prosecution of aider and abettor, Government not precluded from relitigating guilt of principal, who had been acquitted in prior proceeding).  In Standefer, a defendant was charged

---

[5]      Zemlyansky's attempt to apply continuing criminal enterprise cases to this one may be swiftly rejected.  (See Zemlyansky Br. 5).  Title 21, United States Code, Section 848, prohibits engaging in a "continuing criminal enterprise" involving multiple narcotics violations.  21 U.S.C. § 848(c).  The Supreme Court held in Rutledge v. United States, 517 U.S. 292 (1996), that a narcotics conspiracy under 21 U.S.C. § 846 is a lesser included offense within § 848, reasoning that "§ 846 does not require proof of any fact that is not also a part of the CCE [§ 848] offense." Id. at 300.  Whatever the collateral estoppel effect an acquittal of a lesser offense may have on the retrial of a greater offense, there can be no credible dispute that Counts Two through Eight of the S13 Indictment are not lesser included offenses within the RICO conspiracy charged in Count One.  To the contrary, as the Court made clear in its instructions to the jury, each of the stand-alone counts required proof of elements that were not part of the RICO conspiracy count. The § 848 cases relied upon by Zemlyansky (Zemlyansky Br. 5) are thus inapplicable to this case.

with aiding and abetting an IRS official in accepting compensation in addition to that authorized by law.  447 U.S. at 11.  After the IRS official was acquitted of accepting the compensation, the aider and abettor argued that the Government should be precluded under collateral estoppel principles from relitigating an element of his offense — the IRS official's guilt — that had already been decided.  Id. at 13.  The Supreme Court rejected this argument, holding that in criminal cases "nonmutual estoppel" — that is, estoppel where the parties are different — does not apply.  In short, the Court recognized that criminal acquittals are sometimes "erroneous" and concluded that "spread[ing] the effect of an erroneous acquittal to all those who participated in a particular criminal transaction" would be against public interest.  Id. at 25 (internal quotation omitted).  Thus, the acquittals of Zemlyansky can have no preclusive effect with respect to the other defendants charged alongside Zemlyansky.  See id.; see also United States v. Ustica, 847 F.2d 42, 49 (2d Cir. 1988) (on retrial after mistrial, Government not barred from relitigating issue decided in favor of codefendant in separate appeal); Mancuso v. Harris, 677 F.2d 206, 209-10 (2d Cir. 1982) (in habeas proceeding, State not barred from relitigating issue decided in favor of codefendant in separate habeas petition).

Lastly, there is no way knowing what the jury determined when it acquitted Zemlyansky of Counts Two through Eight.  Gabinskaya therefore cannot point to an ultimate issue on the counts remaining against her that was decided by the jury.  Gabinskaya's claim that the jury must have rejected the Government's theory that Zemlyansky was the "ringleader" is both incorrect and beside the point.  The jury may very well have accepted the ringleader theory and concluded that Zemlyansky was the head of the RICO enterprise, but decided that Zemlyansky did not himself agree to commit the health care and mail fraud crimes alleged in Counts Two through Five.  In any event, the jury's determination that Zemlyansky did not

18

commit those crimes says nothing about whether someone else, such as <u>Gabinskaya</u>, committed those crimes.[6]

### III.    The Evidence at Trial Was Sufficient to Establish Zemlyansky's Participation in the RICO Conspiracy Charged in Count One

In one sentence, with no consideration of the voluminous trial record, Zemlyansky argues in the alternative that Count One must be dismissed for insufficient evidence "because no rational jury could convict Zemlyansky of conspiring to violate § 1962(c) while simultaneously acquitting him of the constituent fraud and money laundering conspiracies." (Zemlyansky Br. at 6).[7]   Zemlyansky's sufficiency of the evidence argument is meritless for two reasons.  First, the jury's findings on Counts Two through Eight have no bearing on the sufficiency of the evidence for Count One.  Second, the Government offered ample evidence at trial from which a rational jury could have found Zemlyansky's participation in the RICO conspiracy.

### A.    Applicable Law

#### 1.    Sufficiency of the Evidence

The governing legal standards for assessing the sufficiency of evidence adduced at trial are well-established.  A defendant pressing a post-trial insufficiency of the evidence claim

---

[6]     For the same reasons, the collateral estoppel claims would not bar the Government from relitigating the counts against Danilovich on which the jury failed to reach verdicts — Counts One through Eight.

[7]     Zemlyansky's suggestion that the jury's failure to reach a verdict on Count One was inconsistent with its acquittals on Counts Two through Eight actually undercuts his collateral estoppel argument.  <u>Cf.</u> <u>United States</u> v. <u>Citron</u>, 853 F.2d 1055, 1058 (2d Cir. 1988) ("The defendant's burden is particularly difficult to satisfy when the jury has reached inconsistent verdicts.  Such verdicts, whether based on error, confusion, or a desire to compromise, give little guidance as to the jury's factual findings.  In this context, 'principles of collateral estoppel — which are predicated on the assumption that the jury acted rationally and found certain facts in reaching its verdict — are no longer useful.'") (quoting <u>United States</u> v. <u>Powell</u>, 469 U.S. 57, 68 (1984)).

"bears a very heavy burden," United States v. Desena, 287 F.3d 170, 177 (2d Cir. 2002), and

faces "an uphill battle," United States v. Jones, 30 F.3d 276, 281 (2d Cir. 1994).  See also, e.g.,

United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000).  In evaluating a Rule 29(c)

insufficiency claim, the trial evidence must be viewed in the light most favorable to the

prosecution, United States v. Gonzalez, 110 F.3d 936, 940 (2d Cir. 1997), and the Court must

credit every inference that the jury might have drawn in favor of the Government.  See Jackson

v. Virginia, 443 U.S. 307, 319 (1979); United States v. Masotto, 73 F.3d 1233, 1241 (2d Cir.

1996).  Indeed, the Court must "resolve all issues of credibility in favor of the jury's verdict,"

Desena, 287 F.3d at 177 (internal quotations omitted), United States v. Abelis, 146 F.3d 73, 80

(2d Cir. 1998), and in a close case, where "either of the two results, a reasonable doubt or no

reasonable doubt, is fairly possible, the court must let the jury decide the matter."  Autuori, 212

F.3d at 114 (internal quotation marks and brackets omitted).

   Accordingly, in assessing the evidence, the Court ultimately asks whether "'any

rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt.'"  Autuori, 212 F.3d at 114 (quoting Jackson, 443 U.S. at 319) (emphasis in original);

accord Desena, 287 F.3d at 176; United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999);

United States v. Amato, 15 F.3d 230, 235 (2d Cir. 1994). Under this standard, "[a] court may

enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged

is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."

United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004) (internal quotation marks omitted).

   To sustain a conspiracy conviction, the government must "present some evidence

from which it can reasonably be inferred that the person charged with conspiracy knew of the

existence of the scheme alleged in the indictment and knowingly joined and participated in it."

United States v. Rodriguez, 392 F.3d 539, 545 (2d Cir. 2004) (internal quotation marks omitted). In this context, "deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." United States v. Santos, 541 F.3d 63, 70 (2d Cir. 2008) (internal quotation marks omitted); accord, e.g., United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003).

### 2.    Section 1962(d)

Title 18, United States Code, Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this title." 18 U..S.C. § 1962(d).  The S13 Indictment alleged that the RICO conspiracy participants conspired to violate Section 1962(c).  (S13 Indictment ¶ 23).  At trial, the Court instructed the jury that:

> In order to find that the defendant has conspired to violate Section 1962(c) through a pattern of racketeering activity, the government must prove beyond a reasonable doubt each of the following four elements:  First, that the enterprise alleged by the indictment existed; second, that the enterprise affected interstate or foreign commerce; third, that the defendant was employed by or associated with the enterprise; and fourth, that the defendant knowingly and willfully conspired with at least one other person to participate in the conduct of the affairs of that enterprise through the alleged pattern of racketeering activity.

(Tr. 4818-19).

In United States v. Applins, the Second Circuit held that "the establishment of an enterprise is not an element of [a] RICO conspiracy offense."  637 F.3d at 75.  Rather, to prove the RICO conspiracy count, the Government need only prove that Zemlyansky agreed that an enterprise would be established.  See id. at 74.  To prove an agreement to establish an enterprise, however, the Government may prove that the enterprise was in fact established.  See id. at 77.

### B.      Discussion

### 1.      The Jury's Acquittals on Counts Two through Eight Do Not Demonstrate that the Evidence was Insufficient on Count One

In essence, Zemlyansky argues that there must have been insufficient evidence on Count One because the jury's acquittals on Counts Two through Eight would be inconsistent with a conviction on Count One.  (See Zemlyansky Br. at 6.)  As explained above, however, the jury's acquittals on Counts Two through Eight would not be inconsistent with a conviction on Count One because conspiracy to commit a RICO violation under Section 1962(d) does not require proof that any defendant committed a predicate act.  In any event, "[i]nconsistent verdicts are recognized as within a jury's prerogative."  United States v. Mahaffy, 499 F. Supp. 2d at 295-96 (citing Dunn v. United States, 284 U.S. 390, 391 (1932) ("Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment.").  Zemlyansky's inconsistent verdict argument therefore fails to establish that there was insufficient evidence on Count One.

### 2.      There Was Ample Evidence of Zemlyansky's Participation in the RICO Conspiracy

Moreover, measured against the legal standards set out above, there can be no doubt that the evidence adduced at trial was sufficient as a matter of law to support a conviction for Zemlyansky on Count One.  Indeed, the evidence that the No-Fault Organization existed and that Zemlyansky knowingly and willfully participated in the affairs of that enterprise was extensive.[8]

---

[8]      Given the conclusory nature of the sufficiency argument raised by Zemlyansky, the Government does not attempt here to offer a complete summary of all of the evidence introduced at trial relevant to the existence of the No-Fault Organization and Zemlyansky's knowing participation in that enterprise.  Rather, the Government offers highlights of testimony and non-

With respect to the existence of the enterprise, numerous witnesses testified that the core members of the No-Fault Organization — Zemlyansky, Danilovich, Robert Sukhman, Michael Barukhin and Matthew Conroy, among others — were frequently together and that they collectively oversaw various medical PCs and other entities — the Joseph Vitoulis PC, the Community PC, Clearview MRI, KKM MRI, and the Gerard Tanella Law Office, among others — through which the no-fault fraud was perpetrated:

- Lynda Tadder testified that Zemlyansky and Danilovich were "business partners" who were virtually always together (Tr. 185-86); that they "owned" the Community PC, which they purchased from Boris Treysler and Michael Ostrumsky (Tr. 200-01); that they "owned" another "clinic located on Atlantic Avenue" (i.e., the Joseph Vitoulis PC) (Tr. 186); that they "owned" and "controlled" the Clearview and KKM MRI clinics (Tr. 189-90, 550); and that Danilovich's sister-in-law, Diana Zaidman, oversaw billing for the Community PC (Tr. 303).

- Michelle Glick testified that Zemlyansky and Danilovich were "business partners" (Tr. 1000) who regularly met with the managers of the Community PC, Tadder and Dimitry Lipis (Tr. 1053); that along with Barukhin, Zemlyansky and Danilovich controlled the acupuncture PCs opened by Glick (Tr. 972-74, 1060-1063; see also GX 151, 151T); and that Glick saw Zemlyansky and Danilovich, as well as Zaidman, together at the Tanella Law Office (Tr. 980, 994, 1006, 1013-14), including on one occasion when she went there to open a bank account for the JA Acupuncture PC (Tr. 1013).

- Robert Sukhman testified that Zemlyansky, Danilovich and Barukhin maintained offices at the Tanella Law Office, where meetings with other members of the No-Fault Organization were held, where the business of the No-Fault Organization was discussed, where the billing, collections, and arbitration work for their medical PCs was performed, and where proceeds of the no-fault insurance fraud were "split." (Tr. 1343; 1384, 1449, 1475, 1491; 1495-96; 1514). Sukhman further testified that he owned and controlled the Vitoulis PC with Zemlyansky and Danilovich (Tr. 1274-82); that Zemlyansky and Danilovich also owned and controlled the Clearview and KKM MRI clinics (Tr. 1482); and that KKM was managed by Dmitri Lipis, a brother-in-law of Barukhin (Tr. 1482). Sukhman testified that he, Zemlyansky, and Danilovich used prepaid phones to communicate with each other in an attempt

_____

testimonial evidence that, by itself, is more than sufficient to demonstrate the sufficiency of the evidence on Count One.

to avoid law enforcement surveillance and interception (Tr. 1539).

- Michael Morgan testified that Zemlyansky, Danilovich and Sukhman were partners and that he generally saw them together (Tr. 2215, 2233); that Zemlyansky, Danilovich and Sukhman owned and controlled the Vitoulis PC (Tr. 2243, 2275); and that Morgan and Morgan's partner made cash payments to Zemlyansky, Danilovich and Sukhman at both the Vitoulis PC and the Tanella Law Office (Tr. 2306, 2310, 2314).

- Sander Koyfman testified that Zemlyansky and Danilovich (who Koyfman knew as "Cousin Mike") were always together (Tr. 2609-11, 2630, 2646-47); that Zemlyansky was the true owner of KKM (Tr. 2643); and that Koyfman met Zemlyansky and Danilovich at Clearview MRI and at the Tanella law office (Tr. 2609-11, 2645-46).

- Eva Gateva, who was the paper owner of other no-fault medical PCs (see, e.g., Tr. 1855, 1886), testified that Zemlyansky approached her about becoming the paper owner of what became the Vitoulis PC. (Tr. 1904). Zemlyansky told her that she would be expected to "[n]ot even see patients, just hold the PC and sign the paperwork." (Tr. 1904). Gateva further testified that the clinic controllers and managers at the Vitoulis PC had their own well-appointed office, accessible only by buzzer, where they would conduct their affairs. (Tr. 1916).

- Rick DeBiasi testified about the controllers' office at the Vitoulis PC and that he saw Sukhman, Zemlyansky and Danilovich together in that office. (Tr. 2026, 2031). DeBiasi further testified that he met Zemlyansky, Danilovich and Barukhin together at the Tanella Law Office on multiple occasions to split up proceeds from chiropractic PCs that DeBiasi and Karl Bauer had opened for Zemlyansky and Danilovich. (Tr. 2052-53, 2056).

- Clearview employees testified that they regularly saw Zemlyansky, Danilovich, Barukhin and Sukhman together. For example, Yelena Zorina testified that she regularly saw Zemlyansky, Danilovich and Barukhin at Clearview. (Tr. 3295). And Natalya Maslova testified that Zemlyansky and Danilovich were the bosses at the Tanella Law Office (Tr. 3352), that Lipis and Zaidman both worked at Tanella (Tr. 3351-53, 3360), and that she saw Sukhman come visit Zemlyansky and Danilovich at Tanella. (Tr. 3361).

- Multiple witnesses testified that Matthew Conroy functioned as the No-Fault Organization's in-house attorney, helped the enterprise avoid scrutiny from law enforcement and insurance companies, and coached medical professionals on how to lie to insurance companies (See Tr. 972-74, 1008-1010 (Glick); 1253-56, 1432-34 (Sukhman); 1885 (Gateva); 2210 (Morgan)).

24

There was also significant non-testimonial evidence of the existence of the enterprise.  For

instance:

- Surveillance video and photos showed Zemlyansky, Danilovich and Sukhman together at the Vitoulis PC.  (Tr. 1450-54; GX 261).

- Wiretap interceptions demonstrated that Zemlyansky, Danilovich, Sukhman and Barukhin and others were in frequent contact with each other concerning the operations of the No-Fault Organization.  (See, e.g., GX 102T (Zemlyansky and Sukhman); GX 151T (Conroy discussed with Zemlyansky and Danilovich the various no-fault clinics that they owned and controlled); (GX 114T (Zemlyansky and Barukhin); 159T (Sukhman and Danilovich)).

- Records concerning medical PCs controlled by the No-Fault Organization, including the Vitoulis PC, the Community PC, Clearview MRI, KKM MRI, and the Tanella Law Office, were found together in Diana Zaidman's billing office, DZ Services.  (See, e.g., GX 801A-I, GX 802A-Z, GX 803A-D, GX 805A-V, GX 806A-F, GX 807A-P, GX 808A-N, GX 809, GX 810A-Z, GX 1309).

- Records concerning medical PCs controlled by the No-Fault Organization, including the Vitoulis PC, the Community PC, Clearview MRI, KKM MRI, and the Tanella Law Office, were found together in Michael Barukhin's apartment (See, e.g., GX 811A-N, GX 813A-R, GX 1309).

- Postal records demonstrated that post office boxes for medical PCs controlled by the No-Fault Organization, including Clearview and KKM, were opened by Barukhin and Mark Danilovich, Michael Danilovich's father and the controller of a medical supply PC.  (See GX 30 through GX 37).

There was also ample evidence that the enterprise was engaged in no-fault fraud, and that false

statements were made to insurance companies concerning the ownership of the medical PCs and

the medical necessity of the tests, treatments and equipment being billed.  For instance, multiple

witnesses testified generally about how the fraud was committed:

- Sukhman testified that Zemlyansky had admitted to him that Zemlyansky was the true owner of Clearview, along with Danilovich and Barukhin (Tr. 1489-90), and that Zemlyansky was also the true owner of KKM, along with Danilovich, Barukhin, and Lipis (Tr. 1491); that Sukhman owned and controlled other medical PCs with Zemlyansky, Danilovich and others (Tr. 1229, 1274-82); that as non-medical professionals, they were not permitted to own the PCs, so they paid medical professionals to "hold the PC," or falsely

claim that they were the true owners of the PCs (Tr. 1246-47); that the patients were motivated by hopes of big payouts through litigation (Tr.1263); that Sukhman, Zemlyansky, and Danilovich paid "runners" who identified individuals involved in car accidents who would complain of injuries even if they were not injured or would exaggerate the scope of their injuries (Tr. 1266-67); that the payments to the runners depended on the type of injury the car accident victim would complain of (Tr. 1265-66); that the doctors were expected to refer patients to "modality clinics" for the same menu of tests and treatments regardless of the scope of their injuries in order to generate kickbacks (Tr. 1233,1351-52); that the modalities paid kickbacks to Sukhman, Zemlyansky, Danilovich and others for the referrals (Tr. 1233-34, 1357-58); that attorneys paid kickbacks to Sukhman, Zemlyansky, and Danilovich for patient referrals (Tr. 1361-62); that while the kickbacks were the primary source of money for the clinic controllers, they also made money from bills submitted to insurance companies (Tr. 1234, 1428); that they prepped doctors to lie during examinations under oath by insurance companies (Tr. 1255-56, 1457); and that they laundered checks that they received from insurance companies both to conceal the source of cash they used to pay runners and to conceal income from their medical professional partners (Tr. 1359, 1428).

- Morgan testified that he recruited doctors he termed "docs-in-the-box," including Mintah and Vitoulis, to incorporate PCs for Zemlyansky, Danilovich and Sukhman (Tr. 2211-74, 2465-69); that he billed insurance companies for physical therapy services provided at the Vitoulis PC that he knew were not medically necessary (Tr. 2274-81); that Zemlyansky and Danilovich told a radiologist that they wanted diagnoses of herniations rather than disc bulges (Tr. 2217-18); that Morgan paid cash kickbacks to Zemlyansky, Danilovich and Sukhman for referring physical therapy patients to him (Tr. 2179-81, 2279-83); that for a fee, Morgan laundered insurance company checks for Zemlyansky, Danilovich and Sukhman (Tr.2309-11); and that billers employed by Zemlyansky and Danilovich submitted bills to insurance companies for physical therapy services that were not necessary (Tr. 2313).

- Koyfman testified that he was a "straw owner" of KKM MRI in that he falsely represented himself to be the owner when in fact the true owner was Zemlyansky.  (Tr. 2607, 2643-44).

- Tadder testified that Zemlyansky and Danilovich hired Billy Geris to open a new PC for the Community clinic, to refer patients for tests and treatments, and to sign the bills sent to the insurance companies (Tr. 269-70, 305); that runners brought 85 to 90 percent of Community's patients to the clinics (208); that she paid runners based on the injuries their patients complained of and runners prepped patients to complain of injuries they did not have (Tr. 216-17); that Community referred patients to modality clinics for treatments they did not need and the modalities paid kickbacks to Community for the referrals

(Tr. 276-93); that Community used a spreadsheet to track the referrals so that Tadder knew how much to pay the runners (Tr. 299-302); and that it was Zemlyansky and Danilovich's decision to close down the Community clinic (Tr. 379).

- Glick testified that the acupuncture PCs she incorporated for Danilovich and Zemlyansky billed insurance companies for treatments that were not performed or were not necessary. (Tr. 978, 992-95, 1046, 1049).

- DeBiasi testified that he paid kickbacks to Sukhman for patient referrals to the chiropractic PC that DeBiasi operated at the location of the Vitoulis PC (Tr. 2025-27); and that he recruited Karl Bauer to fraudulently incorporate multiple chiropractic PCs that were owned and controlled by Zemlyansky (Tr. 2049-51).

- Gateva testified that at the Vitoulis PC, she treated patients who she believed to be exaggerating their pain levels and that she made referrals and prescribed treatments that she believed were not medically necessary. (Tr. 1922-23).

- Mikhail Bakhrakh testified that Danilovich taught Bakhrakh how to commit no-fault fraud, including how to pay runners, read police reports, and secure kickbacks from modality clinics for referrals. (Tr. 3453-55). Bakhrakh further testified that he laundered insurance company checks that he received from Danilovich and Sukhman. (Tr. 3485-99).

- Dr. Randall Braddom, the Government's expert, testified that both the Vitoulis and Community PCs inflated their bills to insurance companies and billed insurance companies for treatments that were not necessary. (Tr. 2929). Dr. Braddom further testified that both the Vitoulis and Community PCs referred patients for MRIs that were not necessary. (Tr. 2877-81).

- Testimony of patients treated at the Community PC and Vitoulis PC clinics showed that the insurance companies were billed for unnecessary tests, treatments, and equipment, and in some cases, for tests and treatments that were not performed and equipment that was never provided. For example, Manuel Botero, an undercover detective, testified that he did not receive certain treatments at Community (Tr. 886-87), but insurance companies were billed for those treatments nonetheless. He also testified that he received a trash bag full of medical equipment that he did not need. (Tr. 892). Igor Lazebnik testified that while a patient at Community, he received treatments he did not need for injuries that he had exaggerated (Tr. 623-24, 645-51). Finally, Peter Scarborough testified that he did not recall receiving certain treatments and medical equipment for which the Vitoulis PC or related modalities billed the insurance companies. (Tr. 2495-96, 2503-05, 2528-31).

27

Moreover, there was also non-testimonial evidence demonstrating that the enterprise was engaged in a fraud.  For example:

- Prior to her arrest, Tadder was recorded by an undercover source who she believed to be a runner discussing no-fault fraud.  (GX 160T).

- Sukhman recorded Vitoulis discussing the fraud.  (GX 170T).

- Sukhman produced a spreadsheet tracking treatments and kickbacks from the Vitoulis PC.  (Tr. 1362-72; GX 706, GX 905).

- Numerous wiretap interceptions captured the members of the enterprise discussing the fraud.  (See, e.g., GX 102T (Zemlyansky and Sukhman discussing signature stamp), GX 114T (Zemlyansky tells Barukhin it was their "best mail day, bro, in months"); GX 172T (DeBiasi and Zemlyansky discuss possible surveillance).

- In an examination under oath, Gabinskaya claimed to meet with and examine patients at Clearview, to work at Clearview two to three days per week, to discuss vacation time with Clearview employees, and to handle "minor problems" with Clearview employees. (GX 26-A, GX 27-A).  Four employees from Clearview testified, however, that they either did not know or barely knew Gabinskaya and that Gabinskaya was virtually never at Clearview.  (Tr. 3203-04, 3158, 3288, 3346, 3347).

- All of the bills to insurance companies identified medical professionals as the owners of the Vitoulis PC, the Community PC, Clearview and KKM (GX 301–GX 307), despite testimony from numerous witnesses that those entities were in fact owned and controlled by Zemlyansky and Danilovich.

In addition to the voluminous evidence that the No-Fault Organization existed and was engaged in no-fault fraud, there was ample evidence at trial that Zemlyansky knowingly participated in the enterprise and, in fact, was a leader of the enterprise who directed the actions of others.  For instance, witnesses testified about Zemlyansky's participation in the enterprise:

- Sukhman testified that he referred patients from the no-fault clinics he controlled to the Clearview and KKM MRI clinics controlled by Zemlyansky and Danilovich in exchange for cash kickbacks, which Zemlyansky and Danilovich personally delivered to Sukhman (Tr. 1274; 1483-84); that Zemlyansky guaranteed to Sukhman that a certain percentage of MRI reports would include herniations, which would permit the clinics to refer patients for additional tests and treatments, thereby generating more revenue and

kickbacks (Tr. 1485-86); that Zemlyansky approached Sukhman about opening a no-fault clinic together in the Bronx (Tr. 1275) and Zemlyansky, Danilovich and Sukhman scouted locations in the Bronx to open the clinic (Tr. 1278); that Zemlyansky participated in the management of the Vitoulis clinic and Zemlyansky, Danilovich and Sukhman controlled which modalities provided services at the Vitoulis clinic, which contracts were entered into, which employees were hired and fired, and how much Vitoulis was paid (Tr. 1384-85; 1420-21); that Zemlyansky, Danilovich and Sukhman determined how much the modalities paid in kickbacks (Tr. 1420-23); that Zemlyansky and Danilovich brought in a manager, Eugene Shuman, to help run the Atlantic Clinic for them (Tr. 1283-84; 1460); that Zemlyansky and Danilovich would visit the Atlantic Clinic at least twice per week (Tr. 1342); that Zemlyansky helped recruit and hire Joseph Mintah to be the initial "doc-in-the-box" at the Atlantic clinic (Tr. 1375-79); that Zemlyansky was involved in the decision to replace Mintah with Vitoulis (Tr. 1388, 1392); that Zemlyansky had access to and controlled the Vitoulis clinic bank account (Tr. 1378-79); that Zemlyansky, Danilovich and Sukhman set up the shell company Atlantic Lease Holdings as a way to extract profits from their no-fault clinic (Tr. 1380-81; 1430); that Zemlyansky and Danilovich hired employees at the Atlantic clinic to prepare bills that were submitted to the insurance companies (Tr. 1477); that Zemlyansky, Danilovich and Sukhman received kickbacks from modalities and law firms associated with the Atlantic clinic in cash, checks disguised as "rent" payments, or blank checks that were written to shell companies and cashed through check cashers (Tr. 1357-61; 1372); that Zemlyansky, Danilovich and Sukhman stole checks that were sent by the insurance companies to the physical therapy PC controlled by Morgan and cashed them (Tr. 1520); that Zemlyansky participated in meetings with other members of the enterprise at the Tanella Law Office (Tr. 1495); and that Zemlyansky introduced Sukhman to a check-casher named Gosha, who Sukhman used to cash checks provided by the modality PCs  (Tr. 1526).

- Tadder testified that Zemlyansky paid cash kickbacks to Tadder for referrals from Art of Healing, a no-fault clinic where Tadder worked prior to the Community PC, for MRI referrals to Clearview and KKM that were not medically necessary (Tr. 189-90); that Zemlyansky hired people to work at the medical clinics he controlled, including Tadder at Community and Lipis at KKM (Tr. 193); that Zemlyansky met with Danilovich, Boris Treysler, and Michael Ostrumsky at the Community clinic inside Tadder's office to discuss details of the transfer of ownership of the clinic, including which doctors and modalities would remain at Community after Zemlyansky and Danilovich took over (Tr. 201-02); that Tadder and Lipis co-managed Community and reported to Zemlyansky and Danilovich (Tr. 203); that Tadder discussed day-to-day operations of the Community clinic with Zemlyansky, who decided how much to pay the runners, which insurance companies to accept, which medical procedures and tests should be ordered, which modalities patients should be referred to, and which employees should be hired, fired, and paid

29

first (Tr. 206, 271, 340, 348); that Zemlyansky provided Tadder with cash to pay the runners at Community  (Tr. 551); that Zemlyansky used a prepaid cellphone to communicate with Tadder about the no-fault clinic operations (Tr. 207); that Zemlyansky instructed runners to take patients to the Community clinic around the time that his Atlantic Avenue clinic was closing down (Tr. 208); that Zemlyansky had access to the DST and Community bank accounts (Tr. 265, 343); and that Zemlyansky put Tadder on the phone with Sukhman so that Tadder could provide Sukhman with the name of the functional capacity testing provider at Community for Sukhman's no-fault clinic (Tr. 280-82; GX 157, GX 157-T).

- Morgan testified that he met at a restaurant in Queens with Zemlyansky and Danilovich to introduce them to a radiologist (Tr. 2215); that Morgan met at a restaurant in Manhattan with Zemlyansky, Danilovich and Sukhman to introduce them to Mintah (Tr. 2228); and that Morgan made cash kickback payments to Zemlyansky, Danilovich and Sukhman (Tr. 2279, 2294).

- Glick testified that Zemlyansky picked up the acupuncture progress notes from Glick in order to prepare the bills submitted to the insurance companies (Tr. 996-97); that Zemlyansky gave bills to Glick to sign before they were submitted to the insurance company (Tr. 1000); that Zemlyansky picked up insurance checks for the acupuncture and chiropractic PCs that he controlled from the Queens Integrated Clinic and Community (Tr. 1001, 1057); that Zemlyansky and Danilovich brought Glick to work at the Community clinic and met with her and Lynda Tadder to discuss what treatments she would provide (Tr. 1030); that Zemlyansky shared 90% of the profits from Glick's acupuncture PCs with Danilovich and Diana Zaidman (Tr. 1034); that Zemlyansky determined the amount that Glick and her assistant were paid (Tr. 1034-35); and that Zemlyansky considered replacing Dr. Geris at Community with another doctor but did not want to make insurance companies suspicious (Tr. 1098).

- Gateva testified that Zemlyansky approached her about opening a PC in her name to replace the PC opened by Mintah, which would operate at the Atlantic Avenue clinic location (Tr. 1903); and that Zemlyansky told Gateva that she would be paid $4,000 per week to hold the PC in her name and that she would not even have to see patients (Tr. 1904).

- Koyfman testified that he met with Zemlyansky multiple times to discuss Koyfman's fraudulent ownership of KKM (Tr. 2609-13, 2627, 2630, 2656); that Koyfman exchanged text messages with Zemlyansky about KKM (Tr. 2620 and GX 1209); that Koyfman further met with Zemlyansky when he wanted to close KKM (Tr. 2662); that Zemlyansky falsely told Koyfman that KKM had been transferred to a new owner (Tr. 2667); and that Zemlyansky falsely told Koyfman that all of Koyfman's signature stamps had been

returned (Tr. 2678-79).

- All four Clearview employees testified that Zemlyansky hired them, was regularly at Clearview, and that Zemlyansky ran Clearview (Tr. 3139, 3149, 3156, 3159, 3199, 3202, 3211, 3212, 3282-83, 3285, 3287, 3291-92, 3295, 3333, 3340, 3366 and 3367).  Further, one of those employees, Yelena Zorina, testified that Bridgette Mogilevsky told her that Zemlyansky and Danilovich owned the Vitoulis and KKM PCs (Tr. 3297).

Zemlyansky's knowing participation in the No-Fault Organization was further demonstrated by non-testimonial evidence, including wiretaps (GX 102, 105, 107, 109, 111-119, 140, 151, 157), text messages with Koyfman (GX 1209) and Glick (GX 904A), and contracts he signed with Koyfman (GX 1203–GX 1207).

In short, the evidence at trial establishing the existence of the enterprise charged in Count One and Zemlyansky's knowing and willful participation in the affairs of that enterprise was overwhelming, and certainly sufficient for a jury reasonably to conclude that Zemlyansky committed that offense.

## IV.    The Evidence at Trial Was Sufficient to Support Convictions on Counts Two through Five for Gabinskaya

The evidence at trial was likewise more than sufficient to sustain convictions against Gabinskaya on Counts Two through Five, which charge Gabinskaya with mail fraud, health care fraud and conspiring to do the same.  A reasonable jury could have found from the evidence as a whole that Gabinskaya made false statements to insurance companies about being the "owner" of Clearview.

Phillip Dillon, an employee of the Liberty Mutual insurance company, testified that each no-fault claim for reimbursement requires identification of the actual owner of the professional corporation making the claim.  (Tr. 751-753).  If the PC is not owned by a medical professional, the insurance company will not  pay the claim.  (Tr. 753).  To secure payment from

31

the insurance companies, Clearview therefore needed a doctor to represent to the insurance companies that she owned Clearview.

Clearview got just that.  Each of the bills submitted by Clearview identified Gabinskaya as Clearview's sole owner.  (GX 307).  The evidence at trial demonstrated, however, that Gabinskaya did not in fact own Clearview.

Multiple witnesses testified that Zemlyansky and Danilovich were the owners and controllers of Clearview.  (Tr. 188-89 (Tadder); 1482, 1489-90 (Sukhman); Tr. 2609-12 (Koyfman)).  For instance, Sukhman testified that Zemlyansky admitted to Sukhman that Zemlyansky, along with Danilovich and Barukhin, were the actual owners of Clearview, not Gabinskaya.  (Tr. 1489-90).  Zemlyansky stated that it was his clinic space, that he owned the MRI equipment, that he controlled the staff, and that he subleased the MRI space and equipment to the doctor so that he could charge the doctor whatever he wanted.  (Id.).  Likewise, Koyfman testified that he was the "paper owner" of KKM (Tr. 2607), that Zemlyansky was the "actual owner" (Tr. 2643), and that Zemlyansky told Koyfman that Clearview was being run the same way (Tr. 2615).

Additional witnesses also testified as to Zemlyansky's actual control over Clearview.  For example, four Clearview employees testified that Zemlyansky ran the facility:

- Valerie Yasinov testified that Zemlyansky hired her (Tr. 3139), Zemlyansky had an office at Clearview (Tr. 3149), Zemlyansky was her "boss" (Tr. 3156), Danilovich was her "boss" (Tr. 3159), and that Zemlyansky "owned Clearview" (id.).

- Liya Albanese testified that Zemlyanksy hired her (Tr. 3199), Zemlyansky and Danilovich were both her "boss" (Tr. 3202), Zemlyansky transferred her to the Tanella law office (Tr. 3205), Zemlyansky determined how much to pay her (Tr. 3211), and Zemlyansky was in Clearview "on almost a daily basis" (Tr. 3212).

- Yelena Zorina testified that Zemlyansky hired her (Tr. 3282-83), Zemlyansky had an office at Clearview (Tr. 3285), Zemlyansky's sister-in-law was the office manager (Tr. 3287), she would call Zemlyansky if she had a problem with a patient (Tr. 3291-92), and Zemlyansky was her boss (Tr. 3295).

- Nataliya Maslova testified that she worked for Zemlyansky at Clearview (Tr. 3333), Zemlyansky and Danilovich were both her "boss" (Tr. 3340), Zemlyansky hired her (Tr. 3366), and Zemlyanksy was the "owner" of Clearview (Tr. 3367).

In contrast, the same witnesses either did not know Gabinskaya or barely knew Gabinskaya:

- Yasinov did not know the name "Tatyana Gabinskaya" and did not recognize Gabinskaya in the courtroom.  (Tr. 3158).

- Albanese recognized the name "Gabinskaya" but did not know whether Gabinskaya had a role at Clearview or whether she would recognize Gabinskaya.  (3203-04).

- Zorina thought Gabinskaya was a doctor who referred patients to Clearview for MRIs.  (Tr. 3288).

- Maslova, who worked as a biller for Clearview, recognized Gabinskaya's name from "paperwork" but testified that she had never met Gabinskaya.  (Tr. 3346).  Maslova also did not recognize Gabinskaya in the courtroom.  (Tr. 3347).

In addition to this testimonial evidence, bank records showed $1.3 million going from Clearview's bank accounts to Golden Lease and Golden Equipment, shell companies controlled by Zemlyansky (Tr. 3560-61).

There was also evidence at trial that Gabinskaya lied to an insurance company to convince that insurance company that she owned Clearview.  In an examination under oath conducted by Allstate Insurance, Gabinskaya claimed that she solicited business for Clearview at different doctors' offices (GX 26A 51-52), she met with and examined patients at Clearview before they got MRIs (id. at 52-55), she worked at Clearview a few hours a day for two to three days per week (id. at 54), and she handled vacation and other issues with Clearview employees (id. at 78).  The Clearview employees testified, however, that no doctors worked at Clearview

(Tr. 3160, 3293, 3348), no doctors interviewed patients at Clearview (Tr. 3293), and, as noted above, they either did not know Gabinskaya or just knew her name.

From all of this evidence, a reasonable jury could have inferred that Gabinskaya did not in fact own Clearview but that she understood she needed to falsely represent to the insurance companies that she did own Clearview, or the insurance companies would not pay Clearview's bills.  The jury could have inferred her intent and knowledge to violate Counts Two through Five from the false statements to Allstate.  Indeed, there would be no reason to lie to Allstate about her role at Clearview other than to convince them that she was the owner when she knew that she was not.  Consistent with the Court's instructions, a reasonable jury therefore could have found that Gabinskaya made false statements to the insurance companies.  (Tr. 4792 ("For defendants Gabinskaya, Vitoulis and Geris, a misrepresentation would exist if you found that they were not in fact the owners of the PC that were incorporated under their names.")).

## Conclusion

For the foregoing reasons, the defendants' motions should all be denied.

Dated:      New York, New York
            February 28, 2014

                                Respectfully submitted,

                                PREET BHARARA
                                United States Attorney

            By:     S/ _____
                    Edward Y. Kim
                    Peter M. Skinner
                    Daniel S. Noble
                    Assistant United States Attorneys
                    Tel: (212) 637-2200