IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | 12 Cr. 171 (JPO) |
| v. | The Hon. J. Paul Oetken |
| TATYANA GABINSKAYA, | |
| Defendant. | |

**DEFENDANT TATYANA GABINSKAYA'S MEMORANDUM OF LAW IN SUPPORT
OF ENTERING JUDGMENTS OF ACQUITTAL OR, IN THE ALTERNATIVE,
SETTING ASIDE THE VERDICTS AND GRANTING A NEW TRIAL**

SEAN M. MAHER
*Counsel for Defendant Tatyana Gabinskaya*

The Law Offices of Sean M. Maher, PLLC
233 Broadway, Suite 801
New York, NY 10279
(212) 661-5333
(212) 227-5808 fax

## Preliminary Statement

Dr. Tatyana Gabinskaya, by undersigned counsel, respectfully submits this memorandum of law in support of Dr. Gabinskaya's previously raised Rule 29 motion and, in the alternative, in support of her motion for a new trial under Rule 33.

## I. THE COURT SHOULD ENTER ORDERS OF ACQUITTAL UNDER RULE 29

### A. The Rule 29 Legal Standard

To prevail on a motion for a judgment of acquittal under Rule 29, a defendant must show "the evidence is insufficient to sustain the conviction."[1] The test is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[2] Further, where a fact to be proved is also an element of the offense, "it is not enough that the inferences in the government's favor are permissible;" rather, the inferences must be sufficiently supported to permit a rational juror to find "that the element, like all elements, is established beyond a reasonable doubt."[3] Thus, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt."[4] At the close of evidence, the Court permitted counsel to make Rule 29

---

[1] Fed. R. Crim. P. 29.
[2] *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979).
[3] *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) (citing *United States v. Soto*, 47 F.3d 546, 549 (2d Cir. 1995); *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)).
[4] *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (quoting *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)).

oral arguments and reserved decision.[5] The Court subsequently granted permission for Dr. Gabinskaya to file the instant post-trial submission.

### B. The Elements the Government Needed to Prove

The indictment contained four counts against Dr. Gabinskaya that applied for the period of approximately 2007 through February 29, 2012: conspiracy to commit healthcare fraud, a substantive count of healthcare fraud, conspiracy to commit mail fraud, and a substantive count of mail fraud.

To sustain a conviction on the substantive healthcare fraud charge, the government needed to prove beyond a reasonable doubt (1) that there was either (a) a scheme or artifice to defraud or (b) a scheme or artifice to obtain money or property by false and fraudulent pretenses, representations or promises, in connection with the delivery of, or payment for, healthcare benefits, items or services; (2) that Dr. Gabinskaya knowingly and willfully executed or attempted to execute that scheme with the intent to defraud; and (3) that the target of the scheme was a healthcare benefit program.[6]

The government needed to prove beyond a reasonable doubt that one or more of the alleged misrepresentations were made in furtherance of the alleged scheme, namely that Dr. Gabinskaya made false representations to insurance companies that certain professional corporations were owned by her when, in fact, they were owned by people who were not licensed healthcare professionals.

---

[5] T 958-960; 1108 (T --- denoting the trial transcript).
[6] 18 U.S.C. § 1347 states "Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice -- (1) to defraud any healthcare benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations or promises, any of the money or property owned by, or under the custody or control of, any healthcare benefit program, in connection with the delivery of or payment for healthcare benefits, items, or services shall be guilty of a crime."

To sustain a conviction on the substantive mail fraud count, the government needed to establish beyond a reasonable doubt (1) that there were either (a) a scheme or artifice to defraud or (b) a scheme or artifice to obtain money or property by false and fraudulent pretenses, representations or promises; (2) that Dr. Gabinskaya knowingly and willfully executed or attempted to execute that scheme with the intent to defraud; and (3) that in executing the scheme to defraud, the Dr. Gabinskaya used or caused the use of the mails.[7]

To sustain convictions on the respective conspiracy charges, the government needed to establish each of the following two elements beyond a reasonable doubt: (1) that two or more persons entered the unlawful agreements charged in the indictment; and (2) that Dr. Gabinskaya willfully and knowingly became a member of each conspiracy with the intent to further its illegal purposes as described in the indictment.

### C. The Evidence Presented at Trial

The government's case is summarized below.

#### 1. Insurance Company Employees

Philip Dillon, a regional special investigations unit attorney at Liberty Mutual Insurance Company,[8] and Michael Bruno, a special investigation unit analyst at Allstate Insurance company,[9] testified generally about how no-fault insurance works in New York.[10] Dillon

---

[7] 18 U.S.C. § 1341 states: "Whoever, having devised, or intending to devise, any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the postal service or takes or receives therefrom any such matter or thing or knowingly causes to be delivered by mail, according to the directions thereon or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be guilty of a federal crime."
[8] T 68.
[9] T 318.
[10] T 70-75, 319-323.

testified that Liberty Mutual received no-fault insurance claims from Clearview and described how the claim forms are supposed to be completed.[11] Bruno also testified concerning no-fault claims submitted by Clearview to Allstate.[12]

Dillon confirmed that Dr. Gabinskaya was listed as the owner of Clearview on the official state articles of incorporation[13] and that he had no reason to doubt that Dr. Gabinskaya was a licensed physician, thus meeting a central requirement for ownership of a medical PC.[14]

The government questioned Dillon and Bruno about various factors that their respective insurance companies looks at to decide whether to challenge a claim on the basis that the listed owner is not the true owner of the medical PC. Among factors listed by Dillon were the following:

> Who has day-to-day control of the PC, who runs the business, who has control of the finances of the business. Within each of those general categories we look to see, you know, like I mentioned before, who owns equipment, who has access to bank accounts, who makes deposits, who takes money out of bank accounts. If there's checks written, who's making the checks, who signs the checks, who has filed with the UCC regarding the equipment, who can take depreciations and things of that nature, who hires and fires employees, who set up the business, who found the location, who invested money initially. If there are any loans for the business, who took out those loans, are the loans legitimate? And if there is a management company involved, how much authority does the management company have in the running of the business.[15]

---

[11] T 76-77.
[12] T 323-325.
[13] T 89-90.
[14] T 129, 347. The government did not contest that Dr. Gabinskaya was a properly licensed physician.
[15] T 111-112.

Other factors noted by Bruno and Dillon were the power to open bank accounts,[16] the power to sue on behalf of the PC,[17] who owns shares,[18] the hiring of medical staff,[19] and lying in an EUO.[20]

On cross-examination, Dillon and Bruno conceded there is no set standard for determining "true" ownership of a medical PC.[21] Liberty Mutual and Allstate do not have any set standards, the insurance industry as a whole does not have any set standards, and the law does not provide any set standards.[22] In fact, reasonable professionals can disagree about what factors to use and how much to weigh any given factor.[23]

Both Bruno and Dillon admitted that some factors are more important than others. Namely, properly filing articles of incorporation and being a licensed physician are foundational requirements that, unlike other subjective factors, would justify automatic denial of claims if not present.[24]

Bruno and Dillon agreed on cross-examination that each one of the subjective factors they proffered in and of themselves would not warrant a claim denial. For instance, is perfectly acceptable for a medical PC to do the following things:

- Use a management company;[25]
- Outsource billing;[26]
- Submit claims with a signature stamp;[27]

---

[16] T 173, 370.
[17] T 173.
[18] T 173-74, 370.
[19] T 174.
[20] T 95.
[21] T 192, 371.
[22] T 192, 370-373.
[23] T 373.
[24] T 174-175, 368-369.
[25] T 114.
[26] T 357.
[27] T 150, 360.

- Have a radiologist examine scans off site;[28]
- Have a lawyer handle claims;[29]
- Have a billing company or lawyer receive insurance checks;[30]
- Designate someone to deposit checks;[31] and
- Have a non-physician be an office manager.[32]

Bruno testified that a physician may own multiple medical PCs.[33] In fact, there is no limit to the number of medical PCs a physician may own.[34]

Bruno and Dillon confirmed that there are no legal requirements that:

- The owner of the PC work a certain number of hours at the PC;[35]
- The owner of the PC own the medical equipment used by the PC;[36]
- The owner of the PC be on the premises during MRI scanning;[37] and
- That a radiologist who works for an MRI PC must work on site.[38]

Bruno and Dillon testified that their respective insurance companies utilize various methods to ferret out fraud with no-fault claims, such as peer review, EUOs, requests for more information, additional physician examinations, and site visits.[39] Bruno and Dillon did not testify that they were aware of any incident of fraudulent service conducted by Clearview.

### 2. Golden Lease Employees

The government called three women, Liya Albanese, Valerie Yasinov, and Yelena Zorina, to testify about their experiences working on-site at Clearview. Albanese, Yasinov, and

---

[28] T 147.
[29] T 146.
[30] T 356.
[31] T 148.
[32] T 357-58.
[33] T 362.
[34] T 362.
[35] T 196, 362.
[36] T 192, 359.
[37] T 146, 358.
[38] T 358.
[39] T 134-136; 353-354.

Zorina were hired by Michael Zemlyansky through his staffing company, Golden Lease, to work as non-medical office assistants at Clearview.

Albanese, Yasinov, and Zorina all testified that they received their salary from Michael Zemlyansky and his company Golden Lease.[40] All three worked as front desk receptionists at Clearview.[41] Albanese later worked as a billing assistant.[42] None of the three women were ever charged with committing any crimes.

Albanese testified that the work environment at Clearview was professional and friendly.[43] All three women testified that all patients needed a signed doctor's referral before being seen for an MRI, X-ray, or CT scan.[44]

Albanese and Yasinov never saw Michael Zemlyansky interact with any patients or ever talk with any patients about their injuries or legal claims.[45]

Albanese stated that she saw Dr. Gabinskaya at Clearview two or three times[46]. Zorina testified that she saw Dr. Gabinskaya at Clearview "once or twice."[47] Zorina confirmed that Clearview had a radiologist.[48]

### 3. Abelaida Rosa Martinez Lopez

Abelaida Rosa Martinez Lopez testified that she was in a car accident on October 19, 2009.[49] After being examined by a physician located near hear home, Lopez received a referral

---

[40] T 407, 459, 489.
[41] T 410-411, 429, 454-455, 463, 482.
[42] T 411.
[43] T 409-410.
[44] T 411-412, 457, 467.
[45] T 410, 458.
[46] T 399.
[47] T 476.
[48] T 483.
[49] T 232-233.

to get an MRI at Clearview.[50] Lopez went to Clearview in November of 2009 and underwent a real MRI scan at Clearview.[51] After having the MRI done, Lopez never went back to Clearview again.[52]

Lopez testified that she does not remember being seen by a doctor at Clearview before she was given the MRI.[53] The government argued in its summation that this contradicted Dr. Gabinskaya's statement during the EUO where she stated that she met with Lopez before the MRI.

Lopez was first contacted by government investigators about this matter on Sept 12, 2014, less than two weeks before the beginning of the trial.[54] She had never testified about this previously.[55]

### 4. Cooperating and Immunized Witnesses

The government called two witnesses to testify about their relationship with Michael Zemlyansky, Michael Danilovich, and other men who worked with Zemlyansky and Danilovich. One witness, Lynda Tadder, testified under a cooperation agreement with the government.[56] The other witness, Sander Koyfman, testified under a grant of immunity.[57]

Tadder testified at length about her employment at a medical provider called Art of Healing.[58] Tadder testified about how she and her supervisor Nick Minkin would collect referral

---

[50] T 239.
[51] T 244; *see* Gx 8 at 4.
[52] T 244.
[53] T 241.
[54] T 245.
[55] T 246.
[56] T 605-607.
[57] T 789.
[58] T 608-616.

fees for Art of Healing in return for sending patients to MRI facilities.[59] Tadder testified that Zemlyansky and Danilovich paid referral fees to her on a weekly basis for all referrals that Art of Healing sent to Clearview.[60] Tadder testified that Art of Healing closed in 2010 and that she got a new job working at place called Community Medical, which Tadder claimed was owned by Zemlyansky and Danilovich.[61]

Tadder conceded that she never worked with Dr. Gabinskaya.[62] Tadder never had any discussions with Dr. Gabinskaya.[63] Tadder admitted that she didn't even know Dr. Gabinskaya.[64] Tadder never saw Dr. Gabinskaya interact with Zemlyansky, Danilovich, or anyone else.[65] Tadder testified that she has no idea about the nature of Dr. Gabinskaya's business relationship with Michael Zemlyansky.[66]

Koyfman, a licensed psychiatrist, testified that he entered into a business relationship with Michael Zemlyansky to open an MRI facility. Koyfman testified that he trusted Zemlyansky and thought he was starting a legal, legitimate business with Zemlyansky.[67]

Koyfman testified about the steps he took to ensure what he was doing was legal and legitimate.[68] He consulted relevant websites about the requirements for starting a medical PC.[69] He consulted numerous times with an attorney and an accountant about a variety of business and

---

[59] T 613-615.
[60] T 616-617.
[61] T 633-635.
[62] T 688.
[63] T 688.
[64] T 688.
[65] T 688-689.
[66] T 689.
[67] T 862-866.
[68] T 865-897.
[69] T 865.

10

contractual issues with the new PC.[70] Koyfman did not believe that he was doing anything that would jeopardize his medical license by going into business with Zemlyansky.[71]

Koyfman testified that he began to develop cold feet about the PC when he realized that the PC would focus on no-fault claims, which he found to be "unsavory."[72] Koyfman also testified that he was upset when he saw what he believed to be medical charts with his signature stamp for patients he had not seen.[73]

Koyfman testified that he decided to sever his ties with the PC,[74] but conceded that he remained the owner of the PC for several more months and continued to sign what he believed were medical charts for the PC.[75]

Koyfman admitted that he never worked with Dr. Gabinskaya and never had any discussions with Dr. Gabinskaya.[76] Like Tadder, Koyfman testified that he didn't even know Dr. Gabinskaya.[77] Koyfman never saw Dr. Gabinskaya interact with Zemlyansky, Danilovich, or anyone else.[78] Like Tadder, Koyfman had no idea about the nature of Dr. Gabinskaya's business relationship with Michael Zemlyansky.[79]

### 5. The Examination Under Oath

The government called Ms. Kristine Tereshko, a stenographer, who testified that she transcribed the examination under oath of Dr. Gabinskaya.[80] During the EUO, Dr. Gabinskaya

---

[70] T 870-877, 879.
[71] T 876-877, 887, 903.
[72] T 811.
[73] T 829-831.
[74] T 831-833.
[75] T 841-842; 904-908.
[76] T 854.
[77] T 854.
[78] T 854.
[79] T 855.
[80] T 204-229.

answered questions posed to her by an Allstate attorney. Dr. Gabinskaya also was instructed to not answer some questions by her lawyer, Matthew Conroy, who periodically interjected himself into the examination.

### 6. Physical Evidence Seized By the FBI

The government called four FBI agents – Deniel Deboer,[81] Robert Hanratty,[82] Jared Randall,[83] and Jed Slater[84] who testified about their participation in the arrests Michael Danilovich, Michael Barukhin, and Dr. Gabinskaya. These witnesses also testified about various documents, ATM cards, checks, telephones, and cash seized at DZ Services and the apartments of Michael Barukhin, Michael Danilovich, and Dr. Gabinskaya.

Salter testified that Dr. Gabinskaya gave permission to the FBI to search her apartment.[85] The agents seized Dr. Gabinskaya's computer, thumb drive, and cell phones;[86] the FBI later downloaded her cell phone contacts.[87] No incriminating documents, electronic files, or messages were found at Dr. Gabinskaya's residence or in her computer equipment.

### D. The Evidence at Trial Was Insufficient to Support Conviction

The evidence at trial was insufficient to support conviction on any of the counts because the government failed to establish (1) that Dr. Gabinskaya knowingly and willfully executed or attempted to execute the charged scheme with the intent to defraud; (2) that Dr. Gabinskaya

---

[81] Deboer participated in the arrest of Michael Danilovich, T 248, and the search at 60 Oceania Drive West. T 249.
[82] Hanratty participated in the arrest of Michael Barukhin, T 260, and the search of DZ Services at 2626 E 14th St, Brooklyn. T 261-264.
[83] Randall participated in the arrest of Michael Barukhin on February 29, 2012, T 503, and the search of Barukhin's apartment in the Upper East Side of Manhattan. T 502-506.
[84] Slater participated in the arrest of Dr. Gabinskaya, T 736, and the search of her residence. T 736.
[85] T 736, 751.
[86] T 737, 753.
[87] T 737-738.

misrepresented that she was the legal owner of Clearview; and (3) that Dr. Gabinskaya knowingly and willfully joined a criminal conspiracy to commit healthcare fraud or mail fraud.

Not one witness at trial testified that Dr. Gabinskaya agreed to commit a crime. Not one witness testified that Dr. Gabinskaya ever discussed committing any criminal act with Zemlyansky or any other of the alleged coconspirators. The government was not able to find one email, text message, letter, or document between Dr. Gabinskaya and any the alleged coconspirators that demonstrated that she was a part of any scheme to defraud. Instead of proof beyond a reasonable doubt, the government provided gap-filled circumstantial evidence that provided nothing but a flimsy platform from which the jury could only speculate, guess, and assume that Dr. Gabinskaya committed the charged crimes.

While a jury may convict based upon circumstantial evidence, the circumstantial evidence still must establish guilt beyond a reasonable doubt. That simply is not the case here.

None of the items recovered from the searched locations indicated that Dr. Gabinskaya was a knowing participant in a criminal conspiracy. Instead, the items linked to Dr. Gabinskaya – an unused ATM card, blank starter checks, a few signed checks, blank tax forms, even perhaps a password – are the types of items that one would expect a billing company and its employees to have access to in order to carry out legitimate business transactions on behalf of Clearview. At worst, the presence of the items indicates that employees of DZ Services had access to property of Clearview that those employees took off site to their personal residences, which does not come close to indicating a criminal conspiracy involving Dr. Gabinskaya.

The government's entire case against Dr. Gabinskaya was focused on the EUO and trying to equate purported untruthfulness at the EUO with knowingly and willfully committing the charge crimes.

Far from showing that Dr. Gabinskaya was a knowing and willful coconspirator, the evidence at trial demonstrated that Dr. Gabinskaya, just like Sander Koyfman, believed that she entered into a lawful business relationship with Zemlyansky and that she was the lawful owner of Clearview. Dr. Gabinskaya incorporated the PC properly with the Secretary of State and she was a licensed physician, thus meeting all of the legal designations of ownership. Dr. Gabinskaya entered into legitimate business contracts with Golden Lease, just as Koyfman did after consulting with his lawyer and accountant and getting the go ahead to sign the contracts. As shown by the testimony of Bruno and Dillon, the insurance companies themselves don't even have a clear idea of what factors to use when looking at ownership or how to weigh any given factor. If the insurance companies themselves can't figure out what constitutes legal ownership of a medical PC, how can Dr. Gabinskaya be guilty for knowingly and willfully committing a crime when she behaved no differently than any other lawful medical PC owner?

While the standard to set aside a conviction under Rule 29 is high, it is not insurmountable. The inconclusive circumstantial evidence provided by the government fails to support a conviction even upon Rule 29 review. Accordingly, the Court should vacate the convictions and enter judgments of acquittal on all counts.

## II. THE COURT SHOULD GRANT A NEW TRIAL UNDER RULE 33

Rule 33 provides that upon a defendant's motion, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." The test is whether "letting a guilty verdict stand would be manifest injustice," meaning that the court should be satisfied that "competent, satisfactory, and sufficient evidence in the record supports the jury verdict."[88] A

---

[88] *United States v. Ferguson,* 246 F.3d 129, 134 (2d Cir. 2001)(internal citations omitted).

trial court "has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to [Rule] 29."[89]

For all of the reasons stated in support of Dr. Gabinskaya's Rule 29 motion, the Court, if it declines to enter a judgment of acquittal under Rule 29, alternatively should vacate the convictions and order a new trial under Rule 33.

## Conclusion

WHEREFORE, Dr. Gabinskaya respectfully requests that the Court enter a judgment of acquittal on all counts, or, alternatively, set aside the verdicts and grant a new trial.

Dated:   New York, New York
         November 28, 2014

                                        Respectfully submitted,

                                        _____/S/_____
                                        SEAN M. MAHER
                                        SM 7568

                                        *Counsel for Defendant Tatyana Gabinskaya*
                                        The Law Offices of Sean M. Maher, PLLC
                                        233 Broadway, Suite 801
                                        New York, NY 10279
                                        (212) 661-5333
                                        (212) 227-5808 fax

---

[89] *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).