UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

UNITED STATES OF AMERICA,      :

    - v. -         :        S13 12 Cr. 171 (JPO)

TATYANA GABINSKAYA,     :

          Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


**BRIEF OF THE UNITED STATES OF AMERICA IN RESPONSE TO DEFENDANT TATYANA GABINSKAYA'S MOTIONS FOR ACQUITTAL AND A NEW TRIAL**


PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York  10007


AMANDA KRAMER
JANIS ECHENBERG
Assistant United States Attorneys
  -- Of Counsel --

## PRELIMINARY STATEMENT

Tatyana Gabinskaya ("Gabinskaya" or the "defendant") was convicted of one count of health care fraud, one count of mail fraud, one count of conspiracy to commit health care fraud and one count of conspiracy to commit mail fraud on October 3, 2014, after an eight-day jury trial.  Gabinskaya moves for judgments of acquittal and a new trial based on an alleged insufficiency of the evidence.  Specifically, she contends that the evidence was insufficient to establish: (1) her knowing and willful participation in the charged schemes and conspiracies; and (2) the falsity of her representation that she was the owner of Clearview.  (See Def. Br. at 12-13).[1]  These arguments are without merit and, for the reasons set forth below, Gabinskaya's motions should be denied.

## RELEVANT FACTS

### A.    Procedural History

Gabinskaya was arrested on February 29, 2012 on charges stemming from her role in a fraudulent scheme to defraud providers of no-fault car insurance (the "Victim Insurers").  Among other things, the co-conspirators misrepresented that the medical clinics seeking reimbursement under no-fault insurance policies were owned by licensed medical professionals when they were, in fact, owned by laypeople not legally authorized to own such entities (hereinafter, the "No-Fault Scheme").  Gabinskaya first stood trial in the fall of 2013, along with co-defendants Mikhail Zemlyansky, Michael Danilovich, Joseph Vitoulis, and Billy Geris.  On November 4, 2013, the trial concluded.  The jury acquitted Vitoulis and Geris.

---

[1] "Def. Br." refers to Defendant Tatyana Gabinskaya's Memorandum of Law in Support of Entering Judgments of Acquittal or, in the Alternative, Setting Aside the Verdicts and Granting a New Trial, filed on November 28, 2014. "Tr." refers to the trial transcript in the above-captioned case. "GX" refers to Government Exhibits introduced at trial.

Zemlyansky was acquitted on all counts except for Count One, on which the jury hung.  The jury hung on all counts with respect to Danilovich and Gabinskaya.

On September 22, 2014, trial commenced against Gabinskaya on Indictment S13 12 Cr. 171 (JPO) (the "Indictment"), which charged Gabinskaya in four counts (Counts Two through Five), all in connection with the No-Fault Scheme.  Specifically, Count Two charged the defendant with conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349.  Count Three charged the defendant with health care fraud, in violation of Title 18, United States Code, Sections 1347 and 2.  Count Four charged the defendant with conspiracy to commit mail fraud, in violation of Title 18, United States Code, Section 1349. Count Five charged the defendant with mail fraud, in violation of Title 18, United States Code, Sections 1341 and 2.  On October 3, 2014, a jury convicted Gabinskaya on all four counts.

### B. Summary of Evidence

As the trial evidence amply demonstrated, between approximately 2007 and 2012, Gabinskaya knowingly and willfully participated in the sprawling and multi-faceted No-Fault Scheme primarily by posing as the true owner and controller of a professional corporation ("PC") named Clearview of Brooklyn Medical P.C. ("Clearview"), which provided MRIs and other imaging services.  Gabinskaya allowed her name and medical license to be used by her co-conspirators to open, run and submit claims on behalf of Clearview to get payments from the Victim Insurers.  Gabinskaya signed the incorporation paperwork.  (GX 110).  She signed documents to open a Clearview bank account.  (GX 92).  She also signed exorbitant management and leasing contracts on behalf of Clearview, which allowed the real owners of Clearview to funnel money into their own pockets.  (GX 6, 7, 96, 99).  These steps were taken to deceive the

Victim Insurers into believing that Gabinskaya was the actual owner of Clearview, because the Victim Insurers often checked the New York Department of State website and requested incorporation and bank records in an effort to determine if a medical PC was actually owned and controlled by a doctor. (Tr. 86, 87 (Testimony of Philip Dillon); Tr. 347, 370 (Testimony of Michael Bruno)). In exchange for pretending to be the owner of Clearview, Gabinskaya was paid $1,500 per week by the real owners – Zemlyansky and Danilovich – who were never licensed to practice medicine. (GX 1 p. 88, 50, 50T, 92 p. 33, 181).

Gabinskaya played no actual role at Clearview. She did not see patients. (Tr. 400 (Testimony of Liya Albanese); Tr. 453 (Testimony of Valerie Yasinov); Tr. 476-477 (Testimony of Yelena Zorina)). She did not supervise employees. (Id.). She was barely ever present at Clearview. (Id.). Clearview's employees did not know Gabinskaya, and they knew Mikhail Zemlyansky and Michael Danilovich to be the true owners of Clearview. (Id.). Indeed, Gabinskaya's purely nominal role at Clearview was further demonstrated by the fact that she claimed to be the owner of seven PCs incorporated within a short time period, including five in just one year. In 2007, Gabinskaya incorporated Tatyana Gabinsky Medical (GX 114); in January 2009, she incorporated Novacare Medical (GX 111); in February 2009, she incorporated J&J Medical (GX 112); in March 2009, she incorporated Ridgewood Medical (GX 113), in September 2009, she incorporated Clearview (GX 110), in January 2010, she incorporated PM Pediatrics (GX 115); in April 2010, she incorporated Beta Medical (GX 116). Through the incorporation paperwork, Gabinskaya claimed to be the owner and director of each one of these medical practices. (GX 110-116).

The lies to the Victim Insurers continued on the NF-3 forms – the claim forms used to submit bills in an effort to seek payment. On form after form, Gabinskaya was listed as the owner of Clearview. (GX 70, 70-A, 71, 71-A, 71-B, 72, 73, 73-A, 73-B, 73-C, 73-D, 74, 75, 76, 77, 78, 79, 80, 88). Through these claim forms, the co-conspirators endeavored to defraud the Victim Insurers of millions of dollars; Clearview sought payment of more than $377,000 from just Liberty Mutual, but also submitted claims to USAA, MetLife, Allstate, Geico, Kemper, Sentry, The Hartford, Travelers, and Countrywide. (Tr. 95 (Testimony of Philip Dillon); GX 70-80, 88).

But their efforts to paper over the fraud weren't enough. In December 2010 and January 2011, Gabinskaya was required by Allstate, one of the Victim Insurers, to submit to an examination under oath ("EUO"). (Tr. 206-207 (Testimony of Kristine Tereshko); GX 1, 2). In that two-part EUO, Gabinskaya told several clear, material lies under oath to further the No-Fault Scheme and prevent Victim Insurer Allstate from learning that Gabinskaya was not the true owner of Clearview. The purpose of these lies was to ensure that Allstate would pay the claims submitted by Clearview.

For example, Gabinskaya falsely testified in her EUO that she worked at Clearview "three hours per day," "two, three times a week" during which times she approved days off and conducted a "five, ten minute interview" of all new patients "to determine which MRI comes first." (GX 1 p. 13, 16, 17). Gabinskaya further claimed that she engaged in marketing to obtain new patients. (GX 1). Three Clearview employees, covering the entire 24 hour cycle that Clearview was open, testified credibly and clearly that they were unaware of Gabinskaya having any role with respect to Clearview, and that they understood the Mikes to be

4

the owners of the clinic.  (E.g., Tr. 429-430 (Testimony of Valerie Yasinov)).  Two of them had

no idea who Gabinskaya was.  (E.g., Tr. 399, 453).  Gabinskaya's lies were further illuminated

by Adelaida Martinez, a patient who came to Clearview for an MRI, and credibly testified that

she was never seen or interviewed by a doctor at the clinic (Tr. 241 (Testimony of Adelaida

Martinez)), notwithstanding Gabinskaya's claim that she had interviewed Ms. Martinez (GX 2 at

31).

       In a further effort to pretend to be the owner of Clearview, Gabinskaya lied about

the salary paid to Dr. Shapiro for reading MRIs, which she claimed was the same as her own --

$1,500 per week.  (GX 1 p. 12).  This statement was proven false by the bank records showing

Dr. Shapiro receiving more than $7,500 for a two-week period from the Clearview account.  (GX

92 p. 33).  Either Gabinskaya was intentionally lying to minimize Dr. Shapiro's role and make

her own role seem more substantial, or she didn't know his salary because she wasn't in charge

at all.  Either way, she was perpetrating a fraud.  After each EUO, Gabinskaya called to check in

with Zemlyansky, Clearview's real owner.  ((GX 131-1, 131-2, 133-A, 138).

       Each of the lies Gabinskaya told in the EUOs is a fraudulent misrepresentation in

furtherance of the No-Fault Scheme.  Both Philip Dillon of Liberty Mutual and Michael Bruno of

Allstate – representatives of two of the Victim Insurers – testified at length about why each of

those lies is important in assessing whether the doctor is the true owner or whether there is

improper layperson ownership.  (Tr. 68-203 (Testimony of Philip Dillon); Tr. 318-373

(Testimony of Michael Bruno)).  Such improper layperson ownership would cause the Victim

Insurers to deny claims.  (87, 91 (Testimony of Philip Dillon); Tr. 327 (Testimony of Michael

Bruno)).  In addition, truthfulness in an EUO, in and of itself, is material in determining whether or not to pay a claim.  (Tr. 94 (Testimony of Philip Dillon)).

The notion that Gabinskaya was the actual owner of Clearview is also contradicted by other participants in the scheme.  Lynda Tadder, a cooperating witness who participated in the No-Fault Scheme, testified that she received kickbacks from the Mikes for referring patients to Clearview for MRIs, and that she understood them to be the owners.  (Tr. 622 (Testimony of Lynda Tadder).  Even Danilovich acknowledged on a lawfully intercepted phone call that Gabinskaya was paid $1,500 per week to do nothing more than keep the fraud going.  (See GX 50, 50T ("it's not gonna be like a, let's just say uh, a Tatyana.  You know what I mean?  Fifteen hundred bucks and that's it, keep it moving.")).

Gabinskaya's superficial and criminally fraudulent role at Clearview was further proven through the testimony of Dr. Sander Koyfman, who was hired by Zemlyansky and Dmitry Lipis to pretend to be the owner of an MRI PC called KKM, just as Gabinskaya was hired by Zemlyansky and Danilovich to pretend to be the owner of Clearview.  (See Tr. 786-916 (Testimony of Sander Koyfman)).  Koyfman was paid $1,500 per week just like Gabinskaya.  (Tr. 793 (Testimony of Sander Koyfman)).  Koyfman signed contracts on behalf of his PC with purported management and leasing companies for exorbitant fees just like Gabinskaya.  (Tr. 815-821 (Testimony of Sander Koyfman); GX 161-164).  Those management and leasing contracts were used to siphon money out of the PC and into the pockets of the real owners of the PC.  (GX 161-164, 96, 99, 100).

Koyfman plainly knew from the outset that was he was doing was wrong (Tr. 802 (Testimony of Sander Koyfman)), and when it became obvious that the fraud in ownership of his

PC was part of a larger fraud, he (unlike Gabinskaya) withdrew from the scheme.  (Tr. 832 (Testimony of Sander Koyfman)).

In addition to Dr. Koyfman's testimony, there were many documents received in evidence that demonstrated the parallel criminal relationship between Koyfman and Zemlyansky/Lipis on the one hand, and Gabinskaya and Zemlyansky/Danilovich on the other hand.  For example, bank account records showed that the accounts were opened by Koyfman/Gabinskaya with a de minimis deposit and then all of the deposits and debits were controlled by the so-called management companies, run by the real PC owners.  (GX 90, 92, 96, 99, 100).  It was the real owners and their cohorts – not the doctors – w ho were in possession of all the bank documents (including checkbooks and ATM cards).  (E.g., GX 801C, 801H, 808B-1, 808E-1; 811A, 811B, 811I, 811H, 811N).  The purported management contracts for Clearview and KKM were strikingly similar, and for both PCs, the real PC owners used the management companies to siphon tens of thousands of dollars ($87,000/month for Clearview and $65,000/month for KKM) out of the PCs and into the pockets of the real owners.  (GX 6, 7, 161-164; e.g., GX 99 p. 31).  Several lists and ledgers with passwords and amounts were found in Michael Barukhin's kitchen, which listed many of the clinics that were controlled by the Mikes as part of the scheme, including Clearview and KKM.  (GX 813-E, 813-Q, 813-R, 814 M).[2]

There is no real dispute about the existence of the No-Fault Scheme, which the Government amply proved at trial through, among other evidence, the testimony of Lynda Tadder (Tr. 600-731) and Dr, Sander Koyfman (Tr. 786-916), along with documents and evidence seized during searches of locations used by co-conspirators (e.g., 154, 813E, 813Q-1,

---

[2] These were similar to the list provided by Michael Barukhin to a Post Office employee who couldn't keep track of the co-conspirators' many PCs.  (GX 154).

813R, 814M) and cell phones and phone records (GX 130-134, 136-139, 143). KKM and Clearview, along with at least one of Gabinskaya's other nominally owned PCs – Beta Medical – were plainly part of the No-Fault Scheme. In July 2010, Gabinskaya, through Beta Medical, referred a patient to KKM for an MRI, and the referral form was transmitted by fax to KKM from Clearview. (GX 84). This was entirely consistent with the testimony of a Clearview employee, who said that Clearview only accepted referrals from "affiliated" offices; in other words, clinics that were part of the scheme. (Tr. 439 (Testimony of Valerie Yasinov)).

It was undisputed that the fraud was directed towards health care benefit programs; the Government admitted voluminous evidence consisting of bills from Clearview to numerous insurance companies. (GX 70-80, 88; Tr. 95). It was also undisputed that the mails were used to perpetrate the fraud, which is demonstrated by many of the same bills submitted to insurance companies through the mail. (Tr. 74 (Testimony of Philip Dillon); e.g., GX 70A, 78).

## ARGUMENT

### I. APPLICABLE LAW

A defendant challenging the sufficiency of the evidence under Rule 29 bears a "heavy burden." United States v. Autori, 212 F.3d 105, 114 (2d Cir. 2000). In considering a motion for judgment of acquittal, "[t]he Court 'must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999) (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)).

Accordingly, a motion under Rule 29 must be denied if "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Guadagna, 183 F.3d at 130 (quoting United States v. Resto, 824 F.2d 210, 212 (2d Cir. 1987)).

To prove Gabinskaya guilty of substantive health care fraud and mail fraud, the Government had to prove that there was either (a) a scheme or artifice to defraud or (b) a scheme or artifice to obtain money or property by false and fraudulent pretenses, representations or promises in connection with the delivery of or payment for health care benefits, items or services; that the defendant knowingly and willfully executed or attempted to execute that scheme with the intent to defraud; that the target of the scheme was a health care benefit program; and that the defendant used or caused the use of the mails in executing the scheme.

To prove the two conspiracy charges, the Government had to prove the existence of an agreement or understanding  between the defendant and at least on other person to commit the unlawful object of the charged conspiracy (health care fraud or mail fraud); and that the defendant willfully and knowingly became a member of the conspiracy.  With respect to the conspiracy counts at issue here, the deference accorded a jury's verdict is "especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (internal quotation marks omitted); accord, e.g., United States v. Snow, 462 F.3d 55, 68 (2d Cir. 2006).  As with the other elements of a conspiracy, "a defendant's knowledge of the conspiracy and his participation in it with criminal intent may be established through circumstantial evidence." United States v. Gordon, 987 F.2d 902, 906-07 (2d Cir. 1993).

In a Rule 29 motion, the Court must view the evidence in the light most favorable to the Government, <u>see</u> <u>Autori</u>, 212 F.3d at 114; <u>Guadagna</u>, 183 F.3d at 129, and must "credit" every inference that the jury might have drawn in favor of the government. <u>Hernandez</u>, 85 F.3d at 1029; <u>United States</u> v. <u>Morrison</u>, 153 F.3d 34, 49 (2d Cir. 1998); <u>United States</u> v. <u>Allah</u>, 130 F.3d 33, 45 (2d Cir. 1997); <u>United States</u> v. <u>Masotto</u>, 73 F.3d 1233, 1241 (2d Cir. 1996). Similarly, the Second Circuit has repeatedly emphasized that to defeat a Rule 29 motion, "the government need not 'exclude every reasonable hypothesis other than that of guilt.'" <u>Guadagna</u>, 183 F.3d at 130 (quoting <u>Holland</u> v. <u>United States</u>, 348 U.S. 121, 139 (1954)). Where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the Court] must let the jury decide the matter." <u>Autori</u>, 212 F.3d at 114 (internal quotation marks omitted). Consistent with this approach, all issues of credibility must be resolved in the Government's favor. <u>See</u> <u>United States</u> v. <u>Abelis</u>, 146 F.3d 73, 80 (2d Cir. 1998). "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." <u>United States</u> v. <u>Guadagna</u>, 183 F.3d 122, 130 (2d Cir. 1999) (internal citation and quotation omitted).

Rule 33 gives the trial court discretion to order a new trial or "to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." <u>United States</u> v. <u>Sanchez</u>, 969 F.2d 1409, 1413 (2d Cir. 1992). While the trial court may weigh the evidence and the credibility of the witnesses on a Rule 33 motion, the Second Circuit has warned against "wholly usurping the role of the jury." <u>United States</u> v. <u>Ferguson</u>, 246 F.3d 129, 133 (2d Cir. 2001) (internal quotation marks omitted). Accordingly, "courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility." <u>Id.</u> In general,

the trial court need only satisfy itself that the jury's verdict is supported by "competent, satisfactory and sufficient" evidence, and a verdict should only be overturned where there is "a real concern that an innocent person may have been convicted." Id. (quoting Sanchez, 969 F.2d at 1414).

Similar to Rule 29, the Second Circuit has made plain that trial courts considering whether to grant new trials under Rule 33 "must exercise the Rule 33 authority 'sparingly,'" and only "in 'the most extraordinary circumstances.'" Ferguson, 246 F.3d at 133 (quoting Sanchez, 969 F.2d at 1414). "'It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.'" Id. at 133-34 (quoting Sanchez, 969 F.2d at 1414). In short, the "ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." Id. at 134.

Indeed, "motions for a new trial are disfavored in this Circuit." United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995). "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice; there must be a real concern that an innocent person may have been convicted." United States v. Canova, 412 F.3d 331, 349 (2d Cir. 2005); accord Sanchez, 969 F.2d at 1413; see also United States ex rel. Darcy v. Handy, 351 U.S. 454, 462 (1956) (defendant seeking a new trial bears the "burden of showing the essential unfairness" of the original trial). The denial of a Rule 33 motion is reviewed on appeal only for abuse of discretion. See Stewart, 433 F.3d 273, 295 (2d Cir. 2006); Sanchez, 969 F.2d at 1414.

## II. THE DEFENDANT'S MOTIONS TO VACATE THE JURY'S VERDICT PURSUANT TO RULE 29 AND RULE 33 SHOULD BE DENIED

Gabinskaya's motions under Rule 29 and Rule 33 have no merit, and should be denied. In her motion to vacate the verdict and for a new trial, she claims, in conclusory fashion,

that she did not misrepresent that she was the legal owner of Clearview because she was, in fact, the owner, and that the Government failed to prove that that she knowingly and willfully joined the charged conspiracies. (Def. Br. 12-13). Both of these arguments fail based on the overwhelming weight of the evidence introduced at trial..

Weighing all issues of credibility in favor of the Government, Abelis, 146 F.3d at 80, and crediting every inference in favor of the Government, Hernandez, 85 F.3d at 1029, there was clearly enough evidence that a rational trier of fact could have found the essential elements of all of the charged crimes – substantive health care fraud, substantive mail fraud, conspiracy to commit health care fraud, and conspiracy to commit mail fraud and – beyond a reasonable doubt. Guadagna, 183 F.3d at 130. The Government's evidence included, as detailed above, the testimony of numerous witnesses and documents. The testimony of those witnesses and the supporting documents were mutually reinforcing. In the end, they painted a rich and complete picture of a scheme to defraud in which Gabinskaya participated knowingly and willfully.

The defendant's motions primarily attack the Government's case as circumstantial. She asserts that the Government's proof was insufficient because there was no direct testimony regarding her agreement to commit the charged crimes, and no documents directly connecting her to the charged conspiracy. (Def. Br. 13). This argument assumes a legal standard that does not exist. The evidence of the defendant's involvement in the conspiracy can be direct or circumstantial. United States v. Miranda-Ortiz, 926 F.2d 172, 176 (2d Cir. 1991). To be a "convicted member of a conspiracy, a defendant need not know every objective of the conspiracy," every "detail" about the conspiracy, or "the identity of every co-conspirator." United States v. Gleason, 616 F.2d 2, 16 (2d Cir. 1979); United States v. Martino, 759 F.2d 998, 1003-04 (2d Cir. 1985). Indeed, in many cases there is no single conversation, or single

document, demonstrating the defendant's intent and the agreement among the co-conspirators. The defendant's intent and participation must be shown through the totality of the surrounding circumstances. That is precisely what the Government did here. Through the testimony of various witnesses and supporting documents, as described above, the Government demonstrated Gabinskaya's agreement to commit the crimes charged and her connection to the charged conspiracy beyond a reasonable doubt.

Moreover, Gabinskaya's argument conspicuously overlooks the direct evidence of her participation in the charged crimes in the form of her numerous documented lies under oath in furtherance of the fraud. (GX 1, 2).

As described above, the proof at trial was easily sufficient to permit a jury to conclude that: (i) Gabinskaya was not the true owner of Clearview, but was paid to pretend to be the owner by Zemlyansky and Danilovich as part of the No-Fault Scheme to obtain money from the Victim Insurers; (ii) Gabinskaya knowingly and willfully participated in that scheme with the intent to defraud; (iii) Gabinskaya used or caused the use of the mails in executing the scheme; (iv) there was an agreement or understanding between the defendant and at least one other person to commit health care fraud or mail fraud; and (v) the defendant willfully and knowingly became a member of the conspiracy.

The evidence amply established that Gabinskaya told material lies and falsely held herself out to be the owner of Clearview, although she was merely paid to pretend to be the owner as part of the No-Fault Scheme. There was also ample evidence that Gabinskaya was not involved in seeing patients, marketing to patients, overseeing the staff, hiring the employees or having any say in what they were paid. She had nothing to do with any of the actual operations within the four walls of the office.

Gabinskaya's knowing and willful participation in the No-Fault Scheme was further demonstrated by her repeated material lies in furtherance of the scheme.

## CONCLUSION

For all of these reasons, Gabinskaya's motions under Rule 29 and 33 have no merit, and should be denied.[3]

DATED:      January 16, 2015
               New York, New York

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____/s/_____
       Amanda Kramer
       Janis Echenberg
       Assistant United States Attorneys
       Southern District of New York
       (212) 637-2478/2597

---

[3] Gabinskaya's final argument, that she is somehow innocent because the victim insurance companies do not have clear guidelines to determine true ownership (Br. 14), requires little in the way of response.   The insurance company representatives who testified were quite clear in stating that they do have standards for determining ownership, and such ownership is significant in their analysis.